# TIME, INC. *v.* FIRESTONE

No. 74–944.  Argued October 14, 1975—Decided March 2, 1976

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, and POWELL, JJ., joined. POWELL, J., filed a concurring opinion, in which STEWART, J., joined, *post*, p. 464. BRENNAN, J., *post*, p. 471, WHITE, J., *post*, p. 481, and MARSHALL, J., *post*, p. 484, filed dissenting opinions. STEVENS, J., took no part in the consideration or decision of the case.

*John H. Pickering* argued the cause for petitioner. With him on the briefs were *Harold R. Medina, Jr.,* and *William S. Frates.*

*Edna L. Caruso* argued the cause and filed a brief for respondent.

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner is the publisher of Time, a weekly news magazine. The Supreme Court of Florida affirmed a

$100,000 libel judgment against petitioner which was based on an item appearing in Time that purported to describe the result of domestic relations litigation between respondent and her husband. We granted certiorari, 421 U. S. 909 (1975), to review petitioner's claim that the judgment violates its rights under the First and Fourteenth Amendments to the United States Constitution.

I

Respondent, Mary Alice Firestone, married Russell Firestone, the scion of one of America's wealthier industrial families, in 1961. In 1964, they separated, and respondent filed a complaint for separate maintenance in the Circuit Court of Palm Beach County, Fla. Her husband counterclaimed for divorce on grounds of extreme cruelty and adultery. After a lengthy trial the Circuit Court issued a judgment granting the divorce requested by respondent's husband. In relevant part the court's final judgment read:

> "This cause came on for final hearing before the court upon the plaintiff wife's second amended complaint for separate maintenance (alimony unconnected with the causes of divorce), the defendant husband's answer and counterclaim for divorce on grounds of extreme cruelty and adultery, and the wife's answer thereto setting up certain affirmative defenses. . . .

> "According to certain testimony in behalf of the defendant, extramarital escapades of the plaintiff were bizarre and of an amatory nature which would have made Dr. Freud's hair curl. Other testimony, in plaintiff's behalf, would indicate that defendant was guilty of bounding from one bedpartner to another

with the erotic zest of a satyr. The court is inclined to discount much of this testimony as unreliable. Nevertheless, it is the conclusion and finding of the court that neither party is domesticated, within the meaning of that term as used by the Supreme Court of Florida . . . .

"In the present case, it is abundantly clear from the evidence of marital discord that neither of the parties has shown the least susceptibility to domestication, and that the marriage should be dissolved.

"The premises considered, it is thereupon
"ORDERED AND ADJUDGED as follows:
"1. That the equities in this cause are with the defendant; that defendant's counterclaim for divorce be and the same is hereby granted, and the bonds of matrimony which have heretofore existed between the parties are hereby forever dissolved.

"4. That the defendant shall pay unto the plaintiff the sum of $3,000 per month as alimony beginning January 1, 1968, and a like sum on the first day of each and every month thereafter until the death or remarriage of the plaintiff." App. 523–525, 528.

Time's editorial staff, headquartered in New York, was alerted by a wire service report and an account in a New York newspaper to the fact that a judgment had been rendered in the Firestone divorce proceeding. The staff subsequently received further information regarding the Florida decision from Time's Miami bureau chief and from a "stringer" working on a special assignment basis in the Palm Beach area. On the basis of these four sources, Time's staff composed the following item,

which appeared in the magazine's "Milestones" section the following week:

> "DIVORCED. By Russell A. Firestone Jr., 41, heir to the tire fortune: Mary Alice Sullivan Firestone, 32, his third wife; a onetime Palm Beach schoolteacher; on grounds of extreme cruelty and adultery; after six years of marriage, one son; in West Palm Beach, Fla. The 17-month intermittent trial produced enough testimony of extramarital adventures on both sides, said the judge, 'to make Dr. Freud's hair curl.' "

Within a few weeks of the publication of this article respondent demanded in writing a retraction from petitioner, alleging that a portion of the article was "false, malicious and defamatory." Petitioner declined to issue the requested retraction.[1]

Respondent then filed this libel action against petitioner in the Florida Circuit Court. Based on a jury verdict for respondent, that court entered judgment against petitioner for $100,000, and after review in both the Florida District Court of Appeal and the Supreme Court of Florida the judgment was ultimately affirmed. 305 So. 2d 172 (1974). Petitioner advances several contentions as to why the judgment is contrary to decisions of this Court holding that the First and Fourteenth Amendments of the United States Constitution limit the authority of state courts to impose liability for damages based on defamation.

## II

Petitioner initially contends that it cannot be liable for publishing any falsehood defaming respondent unless

---

[1] Under Florida law the demand for retraction was a prerequisite for filing a libel action, and permits defendants to limit their potential liability to actual damages by complying with the demand. Fla. Stat. Ann. §§ 770.01–770.02 (1963).

it is established that the publication was made "with actual malice," as that term is defined in *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964).[2] Petitioner advances two arguments in support of this contention: that respondent is a "public figure" within this Court's decisions extending *New York Times* to defamation suits brought by such individuals, see, *e. g., Curtis Publishing Co.* v. *Butts,* 388 U. S. 130 (1967); and that the Time item constituted a report of a judicial proceeding, a class of subject matter which petitioner claims deserves the protection of the "actual malice" standard even if the story is proved to be defamatorily false or inaccurate. We reject both arguments.

In *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 345 (1974), we have recently further defined the meaning of "public figure" for the purposes of the First and Fourteenth Amendments:

> "For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved."

Respondent did not assume any role of especial prominence in the affairs of society, other than perhaps Palm Beach society, and she did not thrust herself to the forefront of any particular public controversy in order to influence the resolution of the issues involved in it.

---

[2] The "actual malice" test requires that a plaintiff prove that the defamatory statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U. S., at 280.

Petitioner contends that because the Firestone divorce was characterized by the Florida Supreme Court as a "cause célèbre," it must have been a public controversy and respondent must be considered a public figure. But in so doing petitioner seeks to equate "public controversy" with all controversies of interest to the public. Were we to accept this reasoning, we would reinstate the doctrine advanced in the plurality opinion in *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29 (1971), which concluded that the *New York Times* privilege should be extended to falsehoods defamatory of private persons whenever the statements concern matters of general or public interest. In *Gertz,* however, the Court repudiated this position, stating that "extension of the *New York Times* test proposed by the *Rosenbloom* plurality would abridge [a] legitimate state interest to a degree that we find unacceptable." 418 U. S., at 346.

Dissolution of a marriage through judicial proceedings is not the sort of "public controversy" referred to in *Gertz,* even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public. Nor did respondent freely choose to publicize issues as to the propriety of her married life. She was compelled to go to court by the State in order to obtain legal release from the bonds of matrimony. We have said that in such an instance "[r]esort to the judicial process . . . is no more voluntary in a realistic sense than that of the defendant called upon to defend his interests in court." *Boddie* v. *Connecticut,* 401 U. S. 371, 376–377 (1971). Her actions, both in instituting the litigation and in its conduct, were quite different from those of General Walker in *Curtis Publishing Co., supra.*[3] She assumed no "special promi-

---

[3] Nor do we think the fact that respondent may have held a few press conferences during the divorce proceedings in an attempt to

nence in the resolution of public questions." *Gertz, supra,* at 351. We hold respondent was not a "public figure" for the purpose of determining the constitutional protection afforded petitioner's report of the factual and legal basis for her divorce.

For similar reasons we likewise reject petitioner's claim for automatic extension of the *New York Times* privilege to all reports of judicial proceedings. It is argued that information concerning proceedings in our Nation's courts may have such importance to all citizens as to justify extending special First Amendment protection to the press when reporting on such events. We have recently accepted a significantly more confined version of this argument by holding that the Constitution precludes States from imposing civil liability based upon the publication of truthful information contained in official court records open to public inspection. *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469 (1975).

Petitioner would have us extend the reasoning of *Cox Broadcasting* to safeguard even inaccurate and false statements, at least where "actual malice" has not been established. But its argument proves too much. It may be that all reports of judicial proceedings contain some informational value implicating the First Amendment, but recognizing this is little different from labeling all judicial proceedings matters of "public or general interest," as that phrase was used by the plu-

---

satisfy inquiring reporters converts her into a "public figure." Such interviews should have had no effect upon the merits of the legal dispute between respondent and her husband or the outcome of that trial, and we do not think it can be assumed that any such purpose was intended. Moreover, there is no indication that she sought to use the press conferences as a vehicle by which to thrust herself to the forefront of some unrelated controversy in order to influence its resolution. See *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 345 (1974).

rality in *Rosenbloom.* Whatever their general validity, use of such subject-matter classifications to determine the extent of constitutional protection afforded defamatory falsehoods may too often result in an improper balance between the competing interests in this area. It was our recognition and rejection of this weakness in the *Rosenbloom* test which led us in *Gertz* to eschew a subject-matter test for one focusing upon the character of the defamation plaintiff. See 418 U. S., at 344–346. By confining inquiry to whether a plaintiff is a public officer or a public figure who might be assumed to "have voluntarily exposed [himself] to increased risk of injury from defamatory falsehood," we sought a more appropriate accommodation between the public's interest in an uninhibited press and its equally compelling need for judicial redress of libelous utterances. Cf. *Chaplinsky* v. *New Hampshire,* 315 U. S. 568 (1942).

Presumptively erecting the *New York Times* barrier against all plaintiffs seeking to recover for injuries from defamatory falsehoods published in what are alleged to be reports of judicial proceedings would effect substantial depreciation of the individual's interest in protection from such harm, without any convincing assurance that such a sacrifice is required under the First Amendment. And in some instances such an undiscriminating approach might achieve results directly at odds with the constitutional balance intended. Indeed, the article upon which the *Gertz* libel action was based purported to be a report on the murder trial of a Chicago police officer. See 418 U. S., at 325–326. Our decision in that case should make it clear that no such blanket privilege for reports of judicial proceedings is to be found in the Constitution.

It may be argued that there is still room for application of the *New York Times* protections to more nar-

rowly focused reports of what actually transpires in the courtroom. But even so narrowed, the suggested privilege is simply too broad. Imposing upon the law of private defamation the rather drastic limitations worked by *New York Times* cannot be justified by generalized references to the public interest in reports of judicial proceedings. The details of many, if not most, courtroom battles would add almost nothing toward advancing the uninhibited debate on public issues thought to provide principal support for the decision in *New York Times*. See 376 U. S., at 270; cf. *Rosenblatt* v. *Baer*, 383 U. S. 75, 86 (1966). And while participants in some litigation may be legitimate "public figures," either generally or for the limited purpose of that litigation, the majority will more likely resemble respondent, drawn into a public forum largely against their will in order to attempt to obtain the only redress available to them or to defend themselves against actions brought by the State or by others. There appears little reason why these individuals should substantially forfeit that degree of protection which the law of defamation would otherwise afford them simply by virtue of their being drawn into a courtroom. The public interest in accurate reports of judicial proceedings is substantially protected by *Cox Broadcasting Co., supra.* As to inaccurate and defamatory reports of facts, matters deserving no First Amendment protection, see 418 U. S., at 340, we think *Gertz* provides an adequate safeguard for the constitutionally protected interests of the press and affords it a tolerable margin for error by requiring some type of fault.

## III

Petitioner has urged throughout this litigation that it could not be held liable for publication of the "Milestones" item because its report of respondent's divorce

was factually correct. In its view the Time article faithfully reproduced the precise meaning of the divorce judgment. But this issue was submitted to the jury under an instruction intended to implement Florida's limited privilege for accurate reports of judicial proceedings. App. 509; see 305 So. 2d, at 177. By returning a verdict for respondent the jury necessarily found that the identity of meaning which petitioner claims does not exist even for laymen. The Supreme Court of Florida upheld this finding on appeal, rejecting petitioner's contention that its report was accurate as a matter of law. Because demonstration that an article was true would seem to preclude finding the publisher at fault, see *Cox Broadcasting Co.*, 420 U. S., at 498–500 (POWELL, J., concurring), we have examined the predicate for petitioner's contention. We believe the Florida courts properly could have found the "Milestones" item to be false.

For petitioner's report to have been accurate, the divorce granted Russell Firestone must have been based on a finding by the divorce court that his wife had committed extreme cruelty toward him *and* that she had been guilty of adultery. This is indisputably what petitioner reported in its "Milestones" item, but it is equally indisputable that these were not the facts. Russell Firestone alleged in his counterclaim that respondent had been guilty of adultery, but the divorce court never made any such finding. Its judgment provided that Russell Firestone's "counterclaim for divorce be and the same is hereby granted," but did not specify that the basis for the judgment was either of the two grounds alleged in the counterclaim. The Supreme Court of Florida on appeal concluded that the ground actually relied upon by the divorce court was "lack of domestication of the parties," a ground not theretofore recognized by Florida law. The Supreme Court nonetheless affirmed the judgment dissolving the bonds of matrimony

because the record contained sufficient evidence to establish the ground of extreme cruelty. *Firestone* v. *Firestone*, 263 So. 2d 223, 225 (1972).

Petitioner may well argue that the meaning of the trial court's decree was unclear,[4] but this does not license it to choose from among several conceivable interpretations the one most damaging to respondent. Having chosen to follow this tack,[5] petitioner must be able to establish not merely that the item reported was a conceivable or plausible interpretation of the decree, but that the item was factually correct. We believe there is ample support for the jury's conclusion, affirmed by the Supreme Court of Florida, that this was not the case. There was, therefore, sufficient basis for imposing liability upon petitioner if the constitutional limitations we announced in *Gertz* have been satisfied. These are a prohibition against imposing liability without fault, 418 U. S., at 347, and the requirement that compensatory awards "be supported by competent evidence concerning the injury." *Id.*, at 350.

---

[4] Petitioner is incorrect in arguing that a rational interpretation of an ambiguous document is constitutionally protected under our decision in *Time, Inc.* v. *Pape*, 401 U. S. 279 (1971). There we were applying the *New York Times* standard to test whether the defendant had acted in reckless disregard of the truth. *Id.*, at 292. But as we have concluded that the publication in this case need not be tested against the "actual malice" standard, *Pape* is of no assistance to petitioner.

[5] In fact, it appears that none of petitioner's employees actually saw the decree prior to publication of the "Milestones" article. But we do not think this can affect the extent of constitutional protection afforded the statement. Moreover, petitioner has maintained throughout that it would have published an identical statement if its editorial staff had had an opportunity to peruse the judgment prior to their publication deadline, and has consistently contended that its article was true when compared to the words of that judgment.

As to the latter requirement little difficulty appears. Petitioner has argued that because respondent withdrew her claim for damages to reputation on the eve of trial, there could be no recovery consistent with *Gertz*. Petitioner's theory seems to be that the only compensable injury in a defamation action is that which may be done to one's reputation, and that claims not predicated upon such injury are by definition not actions for defamation. But Florida has obviously decided to permit recovery for other injuries without regard to measuring the effect the falsehood may have had upon a plaintiff's reputation. This does not transform the action into something other than an action for defamation as that term is meant in *Gertz*. In that opinion we made it clear that States could base awards on elements other than injury to reputation, specifically listing "personal humiliation, and mental anguish and suffering" as examples of injuries which might be compensated consistently with the Constitution upon a showing of fault. Because respondent has decided to forgo recovery for injury to her reputation, she is not prevented from obtaining compensation for such other damages that a defamatory falsehood may have caused her.

The trial court charged, consistently with *Gertz*, that the jury should award respondent compensatory damages in "an amount of money that will fairly and adequately compensate her for such damages," and further cautioned that "[i]t is only damages which are a direct and natural result of the alleged libel which may be recovered." App. 509. There was competent evidence introduced to permit the jury to assess the amount of injury. Several witnesses[6] testified to the extent of re-

---

[6] These included respondent's minister, her attorney in the divorce proceedings, plus several friends and neighbors, one of whom was a physician who testified to having to administer a sedative to

spondent's anxiety and concern over Time's inaccurately reporting that she had been found guilty of adultery, and she herself took the stand to elaborate on her fears that her young son would be adversely affected by this falsehood when he grew older. The jury decided these injuries should be compensated by an award of $100,000. We have no warrant for re-examining this determination. Cf. *Lincoln* v. *Power,* 151 U. S. 436 (1894).

## IV

*Gertz* established, however, that not only must there be evidence to support an award of compensatory damages, there must also be evidence of some fault on the part of a defendant charged with publishing defamatory material. No question of fault was submitted to the jury in this case, because under Florida law the only findings required for determination of liability were whether the article was defamatory, whether it was true, and whether the defamation, if any, caused respondent harm.

The failure to submit the question of fault to the jury does not of itself establish noncompliance with the constitutional requirements established in *Gertz,* however. Nothing in the Constitution requires that assessment of fault in a civil case tried in a state court be made by a jury, nor is there any prohibition against such a finding being made in the first instance by an appellate, rather than a trial, court. The First and Fourteenth Amendments do not impose upon the States any limitations as to how, within their own judicial systems, factfinding tasks shall be allocated. If we were satisfied that one of the Florida courts which considered this case had supportably ascertained petitioner

respondent in an attempt to reduce discomfort wrought by her worrying about the article.

was at fault, we would be required to affirm the judgment below.

But the only alternative source of such a finding, given that the issue was not submitted to the jury, is the opinion of the Supreme Court of Florida. That opinion appears to proceed generally on the assumption that a showing of fault was not required,[7] but then in the penultimate paragraph it recites:

> "Furthermore, this erroneous reporting is clear and convincing evidence of the negligence in certain segments of the news media in gathering the news. Gertz v. Welch, Inc., supra. Pursuant to Florida law in effect at the time of the divorce judgment (Section 61.08, Florida Statutes), a wife · found guilty of adultery could not be awarded alimony. Since petitioner had been awarded alimony, she had not been found guilty of adultery nor had the

---

[7] After reiterating its conclusion that the article was false, the Florida court noted that falsely accusing a woman of adultery is libelous *per se* and normally actionable without proof of damages. The court then recognized that our opinion in *Gertz* necessarily displaced this presumption of damages but ruled that the trial court's instruction was consistent with *Gertz* and that there was evidence to support the jury's verdict—conclusions with which we have agreed. The court went on to reject a claim of privilege under state law, pointing out that the privilege shielded only "fair and accurate" reports and the jury had resolved these issues against petitioner. The court appears to have concluded its analysis of petitioner's legal claims with this statement, which immediately precedes the paragraph set out in the text:

"Careful examination and consideration of the record discloses that the judgment of the trial court is correct and should have been affirmed on appeal to the District Court." 305 So. 2d, at 177–178.

There is nothing in the court's opinion which appears to make any reference to the relevance of some concept of fault in determining petitioner's liability.

divorce been granted on the ground of adultery. A careful examination of the final decree prior to publication would have clearly demonstrated that the divorce had been granted on the grounds of extreme cruelty, and thus the wife would have been saved the humiliation of being accused of adultery in a nationwide magazine. This is a flagrant example of 'journalistic negligence.' " 305 So. 2d, at 178.

It may be argued that this is sufficient indication the court found petitioner at fault within the meaning of *Gertz.* Nothing in that decision or in the First or Fourteenth Amendment requires that in a libel action an appellate court treat in detail by written opinion all contentions of the parties, and if the jury or trial judge had found fault in fact, we would be quite willing to read the quoted passage as affirming that conclusion. But without some finding of fault by the judge or jury in the Circuit Court, we would have to attribute to the Supreme Court of Florida from the quoted language not merely an intention to affirm the finding of the lower court, but an intention to find such a fact in the first instance.

Even where a question of fact may have constitutional significance, we normally accord findings of state courts deference in reviewing constitutional claims here. See, *e. g., Lyons* v. *Oklahoma,* 322 U. S. 596, 602–603 (1944); *Gallegos* v. *Nebraska,* 342 U. S. 55, 60–61 (1951) (opinion of Reed, J.). But that deference is predicated on our belief that at some point in the state proceedings some factfinder has made a conscious determination of the existence or nonexistence of the critical fact. Here the record before us affords no basis for such a conclusion.

It may well be that petitioner's account in its "Milestones" section was the product of some fault on its part,

and that the libel judgment against it was, therefore, entirely consistent with *Gertz*. But in the absence of a finding in some element of the state-court system that there was fault, we are not inclined to canvass the record to make such a determination in the first instance. Cf. *Rosenblatt* v. *Baer,* 383 U. S., at 87–88. Accordingly, the judgment of the Supreme Court of Florida is vacated and the case remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE POWELL, with whom MR. JUSTICE STEWART joins, concurring.

A clear majority of the Court adheres to the principles of *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323 (1974). But it is evident from the variety of views expressed that perceptions differ as to the proper application of such principles to this bizarre case. In order to avoid the appearance of fragmentation of the Court on the basic principles involved, I join the opinion of the Court. I add this concurrence to state my reaction to the record presented for our review.

In *Gertz* we held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.,* at 347. Thus, while a State may elect to hold a publisher to a lesser duty of care,[1] there is no First Amendment constraint against

---

[1] A State, if it elected to do so, could require proof of gross negligence before holding a publisher or broadcaster liable for defamation. In *Gertz,* we concluded "that the States should re-

allowing recovery upon proof of negligence. The applicability of such a fault standard was expressly limited to circumstances where, as here, "the substance of the defamatory statement 'makes substantial danger to reputation apparent.'"[2] *Id.,* at 348, quoting *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130, 155 (1967). By requiring a showing of fault the Court in *Gertz* sought to shield the press and broadcast media from a rule of strict liability that could lead to intolerable self-censorship and at the same time recognize the legitimate state interest in compensating private individuals for wrongful injury from defamatory falsehoods.

In one paragraph near the end of its opinion, the Supreme Court of Florida cited *Gertz* in concluding that Time was guilty of "journalistic negligence." But, as the opinion of the Court recognizes, *ante,* at 462 n. 7, and 463, it is not evident from this single paragraph that any type of fault standard was in fact applied. Assuming that Florida now will apply a negligence standard in cases of this kind, the ultimate question here is whether Time exercised due care under the circumstances: Did Time exercise the reasonably prudent care that a State may constitutionally demand of a publisher or broadcaster prior to a publication whose content reveals its defamatory potential?

The answer to this question depends upon a careful consideration of all the relevant evidence concerning Time's actions prior to the publication of the

---

tain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual." 418 U. S., at 345–346.

[2] In amplification of this limitation, we referred to the type of "factual misstatement whose content [does] not warn a reasonably prudent editor or broadcaster of its defamatory potential." *Id.,* at 348.

"Milestones" article. But in its conclusory paragraph finding negligence, the Supreme Court of Florida mentioned only the provision of Florida law that proscribed an award of alimony to a wife found guilty of adultery, arguing that the award of alimony to respondent clearly demonstrated that the divorce was granted on other grounds. There is no recognition in the opinion of the ambiguity of the divorce decree and no discussion of any of the efforts made by Time to verify the accuracy of its news report. Nor was there any weighing of the evidence to determine whether there was actionable negligence by Time under the *Gertz* standard.[3]

There was substantial evidence, much of it uncontradicted, that the editors of Time exercised considerable care in checking the accuracy of the story prior to its publication. The "Milestones" item appeared in the December 22, 1967, issue of Time. This issue went to press on Saturday, December 16, the day after the Circuit Court rendered its decision at about 4:30 in the afternoon. The evening of the 15th the Time editorial staff in New York received an Associated Press dispatch stating that Russell A. Firestone, Jr., had been granted a divorce from his third wife, whom "he had accused of adultery and extreme cruelty." Later that same evening, Time received the New York Daily News edition for December 16, which carried a special bulletin substantially to the same effect as the AP dispatch.

On the morning of December 16, in response to an inquiry sent to its Miami bureau, Time's New York office received a dispatch from the head of that bureau quoting excerpts from the Circuit Court's opinion that

---

[3] The absence of any assessment of fault under the *Gertz* standard by the Supreme Court of Florida is fatal here because there was no such finding at any other level of judgment in this proceeding. *Ante,* at 461–463, and n. 7.

strongly suggested adultery on the part of both parties.[4]
Later that day the editorial staff received a message
from Time's Palm Beach "stringer" that read, in part:
"The technical grounds for divorce according to Joseph
Farrish [sic], Jr., attorney for Mary Alice Firestone, were
given as extreme cruelty and adultry [sic]." App. 532.
The stringer's dispatch also included several quotations
from the Circuit Court opinion.[5] At trial the senior
editor testified that although no member of the New
York editorial staff had read the Circuit Court's opinion,
he had believed that both the stringer and the chief of
Time's Miami bureau had read it.

The opaqueness of the Circuit Court's decree is also a
factor to be considered in assessing whether Time was
guilty of actionable fault under the *Gertz* standard.
Although it appears that neither the head of the Miami
bureau nor the stringer personally read the opinion
or order, the stringer testified at trial that respond-
ent's attorney Farish and others read him portions
of the decree over the telephone before he filed his
dispatch with Time.[6] The record does not reveal whether

---

[4] The excerpts included: " 'According to certain testimony in be-
half of the defendant [husband], extra marital escapades of the
plaintiff [wife] were bizarre and of an amatory nature which would
have made Dr. Freud's hair curl. Other testimony, in the plaintiff's
behalf, would indicate that the defendant was guilty of bounding
from one bed partner to another with the erotic zest of a satyr.' "
App. 544.

[5] Based on these news items and dispatches, the Time editorial
team, consisting of a researcher, writer, and senior editor in charge of
the "Milestones" section of the magazine, wrote, edited, and checked
the article for accuracy. At trial they testified as to their complete
belief in the truth of the news item at the time of publication.

[6] Several hours after filing his dispatch, the stringer spoke with
the divorce judge by telephone. According to testimony of the
stringer at trial the divorce judge read him portions of the decree,
and none of this information was inconsistent with that contained

the limited portions of the decree that shed light on the grounds for the granting of the divorce were read to the stringer.[7] But the ambiguity of the divorce decree may well have contributed to the stringer's view, and hence the Time editorial staff's conclusion, that a ground for the divorce was adultery by respondent.

However one may characterize it, the Circuit Court decision was hardly a model of clarity. Its opening sentence was as follows:

> "This cause came on for final hearing before the court upon the plaintiff wife's second amended complaint for separate maintenance (alimony unconnected with the causes of divorce), the defendant husband's answer and counterclaim for divorce on grounds of extreme cruelty and adultery, and the wife's answer thereto setting up certain affirmative defenses." App. 523.

After commenting on the conflicting testimony as to respondent's "extra marital escapades" and her husband's "bounding from one bedpartner to another," the opinion states that "it is the conclusion and finding of the court that neither party is domesticated . . . ." Finally, the Circuit Court "ORDERED AND ADJUDGED":

> "That the equities in this cause are with the de-

---

in his dispatch to Time; otherwise, he would have alerted Time's New York office immediately.

[7] Time did not consider the stringer to be an employee. He worked for Time part time and was compensated at an hourly rate, although he was guaranteed a minimum amount of work each year. In this case, he was contacted by the chief of the Miami bureau and requested to investigate the Firestone divorce decree. There is thus a question whether the fault, if any, of the stringer in not personally reading the entire opinion and order, is even a factor that may be considered in assessing whether there was actionable fault by Time under *Gertz*. Cf. *Cantrell* v. *Forest City Publishing Co.,* 419 U. S. 245, 253–254 (1974).

fendant; that defendant's counterclaim for divorce be and the same is hereby granted, and the bonds of matrimony which have heretofore existed between the parties are hereby forever dissolved." App. 528.

The remaining paragraphs in the order portion of the decision relate to child custody and support, disposition of certain property, attorney's fees, and the award of $3,000 per month to the wife (respondent) as alimony. There is no reference whatever in the "order" portion of the decision either to "extreme cruelty" or "adultery," the only grounds relied upon by the husband. But the divorce was granted to him following an express finding "that the equities . . . are with the defendant [the husband]."

Thus, on the face of the opinion itself, the husband had counterclaimed for divorce on the grounds of extreme cruelty and adultery, and the court had found the equities to be with him and had granted his counterclaim for divorce. Apart from the awarding of alimony to the wife there is no indication, either in the opinion or accompanying order, that the husband's counterclaim was not granted on both of the grounds asserted. This may be a redundant reading, as either ground would have sufficed. But the opinion that preceded the order was full of talk of adultery and made no explicit reference to any other type of cruelty. In these circumstances, the decision of the Circuit Court may have been sufficiently ambiguous to have caused reasonably prudent newsmen to read it as granting divorce on the ground of adultery.

As I join the opinion of the Court remanding this case, it is unnecessary to decide whether the foregoing establishes as a matter of law that Time exercised the requisite care under the circumstances. Nor have I undertaken to identify all of the evidence that may be relevant or to

point out conflicts that arguably have been resolved
against Time by the jury. My point in writing is to
emphasize that, against the background of a notorious
divorce case, see *Curtis Publishing Co.*, 388 U. S., at 158–
159,[8] and a decree that invited misunderstanding, there
*was* substantial evidence supportive of Time's defense
that it was not guilty of actionable negligence. At the
very least the jury or court assessing liability in this case
should have weighed these factors and this evidence be-
fore reaching a judgment.[9] There is no indication in the
record before us that this was done in accordance with
*Gertz.*[10]

---

[8] In its first opinion remanding the case to the District Court of
Appeal, after referring to the general prominence of the Firestones,
the Supreme Court of Florida indicated that "their marital diffi-
culties were equally well known; and the charges and countercharges
of meretriciousness, flowing from both sides of the controversy, made
their divorce action a veritable *cause celebre* in social circles across
the country." 271 So. 2d 745, 751 (1972). The District Court of
Appeal similarly observed that in part due to the sensational and
colorful testimony the 17-month divorce trial had been the object
of national news coverage. 254 So. 2d 386, 389 (1971). The
reports Time received that the decree was granted on the ground
of adultery therefore were consistent with the well-publicized trial
revelations.

[9] Indeed, I agree with the view expressed by Mr. Justice Mar-
shall in his dissenting opinion: Unless there exists some basis for a
finding of fault other than that given by the Supreme Court of
Florida there can be no liability.

[10] The Florida District Court of Appeal, on the second appeal to it,
reversed a judgment for respondent. In doing so, it applied the
*New York Times* "actual malice" standard, but added: "Nowhere
was there proof Time was even negligent, much less intentionally
false or in reckless disregard of the truth." 254 So. 2d, at 390. A
problem infecting the various decisions in the Florida courts is the
understandable uncertainty as to exactly what standard should be
applied. This case was in litigation several years before *Gertz* was
decided.

Mr. Justice Brennan, dissenting.

In my view, the question presented by this case is the degree of protection commanded by the First Amendment's free expression guarantee where it is sought to hold a publisher liable under state defamation laws for erroneously reporting the results of a public judicial proceeding.

I

In a series of cases beginning with *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), this Court has held that the laws of libel and defamation, no less than other legal modes of restraint on the freedoms of speech and press, are subject to constitutional scrutiny under the First Amendment. The Court has emphasized that the central meaning of the free expression guarantee is that the body politic of this Nation shall be entitled to the communications necessary for self-governance, and that to place restraints on the exercise of expression is to deny the instrumental means required in order that the citizenry exercise that ultimate sovereignty reposed in its collective judgment by the Constitution.[1] Accordingly, we have held that laws governing harm incurred by individuals through defamation or invasion of privacy, although directed to the worthy objective of ensuring the "essential dignity and worth of every human being" necessary to a civilized society, *Rosenblatt* v. *Baer,* 383 U. S. 75, 92 (1966) (Stewart, J., concurring), must be measured and limited by constitutional con-

---

[1] See Kalven, The New York Times Case: A Note on "The Central Meaning of the First Amendment," 1964 Sup. Ct. Rev. 191; Meiklejohn, The First Amendment Is An Absolute, 1961 Sup. Ct. Rev. 245. See also Bloustein, The First Amendment and Privacy: The Supreme Court Justice and the Philosopher, 28 Rutgers L. Rev. 41 (1974); Meiklejohn, Public Speech in the Supreme Court Since New York Times v. Sullivan, 26 Syracuse L. Rev. 819 (1975).

straints assuring the maintenance and well-being of the system of free expression. Although "calculated falsehood" is no part of the expression protected by the central meaning of the First Amendment, *Garrison* v. *Louisiana,* 379 U. S. 64, 75 (1964), error and misstatement is recognized as inevitable in any scheme of truly free expression and debate. *New York Times, supra,* at 271–272. Therefore, in order to avoid the self-censorship that would necessarily accompany strict or simple fault liability for erroneous statements, rules governing liability for injury to reputation are required to allow an adequate margin for error—protecting some misstatements so that the "freedoms of expression . . . have the 'breathing space' that they 'need . . . to survive.'" *Ibid.* "[T]o insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." *St. Amant* v. *Thompson,* 390 U. S. 727, 732 (1968). For this reason, *New York Times* held that liability for defamation of a public official may not be imposed in the absence of proof of actual malice on the part of the person making the erroneous statement. 376 U. S., at 279–280.[2]

---

[2] The protection of the actual-malice test extends to erroneous statements that in any way "might touch on . . . [the] fitness for office" of a public official, *Garrison* v. *Louisiana,* 379 U. S. 64, 77 (1964), or a candidate for public office, *Monitor Patriot Co.* v. *Roy,* 401 U. S. 265, 274 (1971). The actual-malice standard has been applied "at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs," *Rosenblatt* v. *Baer,* 383 U. S. 75, 85 (1966), and further to "public figures" who are "intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130, 164 (1967) (Warren, C. J., concurring in result).

As an erroneous judgment of liability is, in view of the First

Identical considerations led the Court last Term in *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469 (1975), to hold that the First Amendment commands an absolute privilege to truthfully report the contents of public records reflecting the subject matter of judicial proceedings. Recognizing the possibility of injury to legitimate privacy interests of persons affected by such proceedings, the Court was nevertheless constrained in light of the strong First Amendment values involved to conclude that no liability whatever could be imposed by the State for reports damaging to those concerns. Following the reasoning of *New York Times* and its progeny, the Court in *Cox Broadcasting* noted:

> "[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of govern-

---

Amendment values at stake, of more serious concern than an erroneous judgment in the opposite direction, *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29, 50 (1971), the Court has held that actual malice must be demonstrated with "convincing clarity." *New York Times,* 376 U. S., at 285–286. The actual-malice standard requires a showing that the erroneous statements were made in knowing or reckless disregard of their falsity, *id.,* at 280, and has been otherwise defined as requiring a showing that the statements were made by a person who in fact was entertaining "serious doubts" as to their truth. *St. Amant* v. *Thompson,* 390 U. S. 727, 731 (1968).

ment generally. With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice. . . .

. . . . .

". . . Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business." 420 U. S., at 491–492, 495.

Crucial to the holding in *Cox Broadcasting* was the determination that a "reasonable man" standard for imposing liability for invasion of privacy interests is simply inadequate to the task of safeguarding against "timidity and self-censorship" in reporting judicial proceedings. *Id.,* at 496. Clearly, the inadequacy of any such standard is no less in the related area of liability for defamation resulting from inadvertent error in reporting such proceedings.

## II

It is true, of course, that the Court in *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323 (1974), cut back on the scope of application of the *New York Times* privilege as it had evolved through the plurality opinion in *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29 (1971). *Rosenbloom* had held the *New York Times* privilege applicable to "all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous." 403 U. S., at 44. But in light of the Court's percep-

tion of an altered balance between the conflicting values at stake where the person defamed is in some sense a "private individual," *Gertz, supra,* at 347, 349–350, held First Amendment interests adequately protected in such circumstances so long as defamation liability is restricted to a requirement of "fault" and proof of "actual injury" resulting from the claimed defamation.[3]   418 U. S.,

---

[3] In this case, the $100,000 damage award was premised entirely on the injury of mental pain and anguish. All claims as to injury to reputation were withdrawn prior to trial, and no evidence concerning damage to reputation was presented at trial. (Indeed, it appears that petitioner was affirmatively precluded from offering evidence to refute any possible jury assumption in this regard by a pretrial order granting "Plaintiff's Motion to Limit Testimony," App. 77.) It seems clear that by allowing this type of recovery the State has subverted whatever protective influence the "actual injury" stricture may possess. *Gertz* would, of course, allow for an award of damages for such injury after proof of injury to reputation. 418 U. S., at 349–350. But to allow such damages without proof "by competent evidence" of any other "actual injury" is to do nothing less than return to the old rule of presumed damages supposedly outlawed by *Gertz* in instances where the *New York Times* standard is not met. 418 U. S., at 349. See Anderson, Libel and Press Self-Censorship, 53 Tex. L. Rev. 422, 472–473 (1975); Eaton, The American Law of Defamation through *Gertz* v. *Robert Welch, Inc.* and Beyond: An Analytical Primer, 61 Va. L. Rev. 1349, 1436–1437 (1975). The result is clearly to invite "gratuitous awards of money damages far in excess of any actual injury" and jury punishment of "unpopular opinion rather than [compensation to] individuals for injury sustained by the publication of a false fact." *Gertz, supra,* at 349.

Furthermore, the allowance of damages for mental suffering alone will completely abrogate the use of summary judgment procedures in defamation litigation. Cf. Anderson, *supra,* at 469 n. 218. The use of such summary procedures may be a critical factor enabling publishers to avoid large litigation expenses in marginal and frivolous defamation suits. The specter of such expenses may be as potent a force for self-censorship as any threat of an ultimate damages award. See generally *ibid.*

at 349–350.   However, the extension of the relaxed standard of *Gertz* to news reporting of events transpiring in and decisions arising out of public judicial proceedings is unwarranted by the terms of *Gertz* itself, is contrary to other well-established precedents of this Court and, most importantly, savages the cherished values encased in the First Amendment.

There is no indication in *Gertz* of any intention to overrule the *Rosenbloom* decision on its facts.  Confined to those facts, *Rosenbloom* holds that in instances of erroneous reporting of the public actions of public officials, the *New York Times* actual-malice standard must be met before liability for defamation may be imposed in favor of persons affected by those actions.  Although *Gertz* clearly altered the broader rationale of *Rosenbloom,* until the Court's decision today it could not have been supposed that *Rosenbloom* did not remain the law roughly to the extent of my Brother WHITE's concurring statement therein:

> "[I]n defamation actions, absent actual malice as defined in *New York Times Co.* v. *Sullivan,* the First Amendment gives the press and the broadcast media a privilege to report and comment upon the official actions of public servants in full detail, with no requirement that the reputation or the privacy of an individual involved in or affected by the official action be spared from public view."   403 U. S., at 62.[4]

At stake in the present case is the ability of the press to report to the citizenry the events transpiring in the Nation's judicial systems.   There is simply no meaningful

---

[4] Cf. Anderson, *supra,* n. 3, at 450–451, concluding that the *Gertz* opinion suggests a "category of involuntary public figures" roughly equivalent to "individual[s] involved in or affected by . . . official action" as defined by my Brother WHITE in *Rosenbloom,* 403 U. S., at 62.

or constitutionally adequate way to report such events without reference to those persons and transactions that form the subject matter in controversy.[5]  This Court has long held:

> "A trial is a public event.  What transpires in the court room is public property . . . .  Those who see and hear what transpired can report it with impunity.  There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it."  *Craig* v. *Harney,* 331 U. S. 367, 374 (1947).[6]

The Court has recognized that with regard to the judiciary, no less than other areas of government, the press performs an indispensable role by "subjecting the . . . judicial processes to extensive public scrutiny and criticism." *Sheppard* v. *Maxwell,* 384 U. S. 333, 350 (1966). And it is critical that the judicial processes be open to such scrutiny and criticism, for, as the Court has noted in the specific context of labor disputes, the more acute public controversies are, "the more likely it is that in some aspect they will get into court." *Bridges* v. *California,* 314 U. S. 252, 268–269 (1941).[7]  Indeed, slight

---

[5] Cf. *Rosenbloom* v. *Metromedia, Inc., supra,* at 61 (WHITE, J., concurring):

"Discussion of the conduct of public officials cannot . . . be subjected to artificial limitations designed to protect others involved in an episode with officials from unfavorable publicity.  Such limitations would deprive the public of full information about the official action that took place."

[6] *Craig* also refutes any contention that private civil litigation is somehow different in this respect.  331 U. S., at 378.

[7] An early and sympathetic observer of our Nation's political system commented:

"The judicial organization of the United States is the institution

reflection is needed to observe the insistent and complex interaction between controversial judicial proceedings and popular impressions thereof and fundamental legal and political changes in the Nation throughout the 200 years of evolution of our political system. With the judiciary as with all other aspects of government, the First Amendment guarantees to the people of this Nation that they shall retain the necessary means of control over their institutions that might in the alternative grow remote, insensitive, and finally acquisitive of those attributes of sovereignty not delegated by the Constitution.[8]

Also no less true than in other areas of government, error in reporting and debate concerning the judicial process is inevitable. Indeed, in view of the complexities of that process and its unfamiliarity to the laymen

---

which a stranger has the greatest difficulty in understanding. He hears the authority of a judge invoked in the political occurrences of every day, and he naturally concludes that in the United States the judges are important political functionaries; nevertheless, when he examines the nature of the tribunals, they offer at the first glance nothing that is contrary to the usual habits and privileges of those bodies; and the magistrates seem to him to interfere in public affairs only by chance, but by a chance that recurs every day.

"Scarcely any political question arises in the United States that is not resolved, sooner or later, into a judicial question." 1 A. de Tocqueville, Democracy in America 98, 280 (P. Bradley ed. 1948).

[8] Even those who would narrowly confine the central meaning of the First Amendment to "explicitly political speech" recognize that this must extend to all speech "concerned with governmental behavior, policy or personnel, whether the governmental unit involved is executive, legislative, judicial or administrative." Bork, Neutral Principles and Some First Amendment Problems, 47 Ind. L. J. 1, 27–28 (1971).

who report it, the probability of inadvertent error may be substantially greater.[9]

"There is perhaps no area of news more inaccurately reported factually, on the whole, though with some notable exceptions, than legal news.

---

[9] The difficulties encountered by laymen attempting to report in summarized form the results of judicial proceedings are surely illustrated in the instant case. Respondent's husband in counterclaiming for divorce had alleged grounds of "extreme cruelty and adultery," a fact reported in the subsequent judicial opinion. That opinion went on to state:

"According to certain testimony in behalf of the defendant, extra marital escapades of the plaintiff were bizarre and of an amatory nature which would have made Dr. Freud's hair curl. Other testimony, in plaintiff's behalf, would indicate that defendant was guilty of bounding from one bedpartner to another with the erotic zest of a satyr. The court is inclined to discount much of this testimony as unreliable. Nevertheless, it is the conclusion and finding of the court that neither party is domesticated, within the meaning of that term as used by the Supreme Court of Florida in the case of Chesnut v. Chesnut, 33 So. 2d 730, where the court, in holding that a divorce rather than separate maintenance should be granted, said:

" 'The big trouble was total incapacity on the part of either for domestication. Seventy-five per cent of successful marriage depends on tact to cushion and bypass domestic frictions. It is much better than meeting them head on and bearing the scars they leave. When the bride and the groom are both devoid of a yen for domestication, the marital bark puts out to sea with its jib pointed to the rocks. . . . We think the record reveals a complete allergy to the give and take essential to successful marriage.'

.        .        .        .        .

"In the present case, it is abundantly clear from the evidence of marital discord that neither of the parties has shown the least susceptibility to domestication, and that the marriage should be dissolved.

.        .        .        .        . .

"The premises considered, it is thereupon
"ORDERED AND ADJUDGED as follows:
"1. That the equities in this cause are with the defendant; that defendant's counterclaim for divorce be and the same is hereby

"Some part of this is due to carelessness . . . . But a great deal of it must be attributed, in candor, to ignorance which frequently is not at all blameworthy. For newspapers are conducted by men who are laymen to the law. With too rare exceptions their capacity for misunderstanding the significance of legal events and procedures, not to speak of opinions, is great. But this is neither remarkable nor peculiar to newsmen. For the law, as lawyers best know, is full of perplexities.

"In view of these facts any standard which would require strict accuracy in reporting legal events factually or in commenting upon them in the press would be an impossible one. Unless the courts and judges are to be put above criticism, no such rule

---

granted, and the bonds of matrimony which have heretofore existed between the parties are hereby forever dissolved." App. 523–529.

The Florida Supreme Court in the instant action found the fault required by *Gertz,* 418 U. S., at 347, to be present in the record by virtue of the fact that

"[p]ursuant to Florida law in effect at the time of the divorce judgment . . . a wife found guilty of adultery could not be awarded alimony. Since petitioner had been awarded alimony, she had not been found guilty of adultery nor had the divorce been granted on the ground of adultery. A careful examination of the final decree prior to publication would have clearly demonstrated that the divorce had been granted on the grounds of extreme cruelty . . . ." 305 So. 2d 172, 178 (1974).

Surely the threat of press self-censorship in reporting judicial proceedings is obvious if liability is to be imposed on the basis of such "fault." Indeed, the impossibility of assuring against such errors in reporting is manifested by the fact that the same Florida Supreme Court, in reviewing the judgment of divorce some two and one-half years previous to the above-quoted statement, had found the divorce to have been granted by the trial judge on the erroneous grounds of "lack of domestication" rather than for either extreme cruelty or adultery. *Firestone* v. *Firestone,* 263 So. 2d 223 (1972).

can obtain. There must be some room for misstatement of fact, as well as for misjudgment, if the press and others are to function as critical agencies in our democracy concerning courts as for all other instruments of government." *Pennekamp* v. *Florida,* 328 U. S. 331, 371–372 (1946) (Rutledge, J., concurring).[10]

For precisely such reasons, we have held that the contempt power may not be used to punish the reporting of judicial proceedings merely because a reporter "missed the essential point in a trial or failed to summarize the issues to accord with the views of the judge who sat on the case." *Craig* v. *Harney,* 331 U. S., at 375. See also *Pennekamp* v. *Florida, supra.* And "[w]hat a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel." *New York Times,* 376 U. S., at 277. The First Amendment insulates from defamation liability a margin for error sufficient to ensure the avoidance of crippling press self-censorship in the field of reporting public judicial affairs. To be adequate, that margin must be both of sufficient breadth and predictable in its application. In my view, therefore, the actual-malice standard of *New York Times* must be met in order to justify the imposition of liability in these circumstances.

MR. JUSTICE WHITE, dissenting.

I would affirm the judgment of the Florida Supreme Court because First Amendment values will not be furthered in any way by application to this case of the fault standards newly drafted and imposed by *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323 (1974), upon which my

---

[10] Judge Frank's opinion of the phenomenon and its cause appears to have been roughly comparable. J. Frank, Courts On Trial 1–3 (Atheneum ed. 1963).

Brother REHNQUIST relies, or the fault standards required by *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29 (1971), upon which my Brother BRENNAN relies; and because, in any event, any requisite fault was properly found below.

The jury found on ample evidence that the article published by petitioner Time, Inc., about respondent Firestone was false and defamatory. This Court has held, and no one seriously disputes, that, regardless of fault, "there is no constitutional value in false statements of fact." "They belong to that category of utterances which '. . . are of such slight social value as' " to be worthy of no First Amendment protection. *Gertz* v. *Robert Welch, Inc., supra*, at 340, quoting *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 572 (1942). This Court's decisions from *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), through *Gertz* v. *Robert Welch, Inc., supra*, holding that the Constitution requires a finding of some degree of fault as a precondition to a defamation award, have done so for one reason and one reason alone: unless innocent falsehood is allowed as a defense, some true speech will also be deterred. Thus "[t]he First Amendment requires that we protect some falsehood *in order to protect speech that matters*," *Gertz* v. *Robert Welch, Inc., supra*, at 341 (emphasis supplied), *e. g.*, true fact statements. In light of these decisions, the threshold question in the instant case should be whether requiring proof of fault on the part of Time, Inc., as a precondition to recovery in this case— and thereby possibly interfering with the State's desire to compensate respondent Firestone—will contribute in any way to the goal of protecting "speech that matters." I think it would not.

At the time of the defamatory publication in this case—December 1967—the law clearly authorized lia-

bility without fault in defamation cases of the sort involved here.* Whatever the chilling effect of that rule of law on publication of "speech that matters" in 1967 might have been, it has already occurred and is now irremediable. The goal of protecting "speech that maters" by announcing rules, as this Court did in *Gertz* v. *Robert Welch, Inc., supra,* and *Rosenbloom* v. *Metromedia, Inc., supra,* requiring fault as a precondition to a defamation recovery under circumstances such as are involved here, is *fully* achieved so long as fault is required for cases in which the publication occurred *after* the dates of those decisions. This is not such a case.

Therefore, to require proof of fault in this case—or in any other case predating *Gertz* and *Rosenbloom* in which a private figure is defamed—is to interfere with the State's otherwise legitimate policy of compensating defamation victims without furthering First Amendment goals *in any way at all.* In other areas in which the Court has developed a rule designed not to achieve justice in the case before it but designed to induce socially desirable conduct by some group in the future, the Court has declined to apply the rule to fact situations predating its announcement, *e. g., Williams* v.

---

*Konigsberg* v. *State Bar of California,* 366 U. S. 36, 49, and n. 10 (1961); *Times Film Corp.* v. *Chicago,* 365 U. S. 43, 48 (1961); *Roth* v. *United States,* 354 U. S. 476, 486–487 (1957); *Beauharnais* v. *Illinois,* 343 U. S. 250, 266 (1952); *Pennekamp* v. *Florida,* 328 U. S. 331, 348–349 (1946); *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572 (1942); *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697, 715 (1931). The majority concludes that respondent Firestone was neither a "public official" nor a "public figure," *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964); *Curtis Publishing Co.* v. *Butts,* 388 U. S. .130 (1967), and therefore that this case does not fall within any exception, then announced, to the Court's statements that common-law defamation rules do not violate the First Amendment. In this respect I agree with the majority.

*United States,* 401 U. S. 646, 653 (1971) (plurality opinion). The Court should follow a similar path here.

In any event, the judgment of the court below should be affirmed. My Brother REHNQUIST concludes that negligence is sufficient fault, under *Gertz,* to justify the judgment below, and that a finding of negligence may constitutionally be supplied by the Florida Supreme Court. I agree. Furthermore, the state court referred to *Gertz* v. *Robert Welch, Inc.,* by name; noted the "convincing evidence of . . . negligence" in the case; pointed out that a careful examination of the divorce decree would have "clearly demonstrated" that the divorce was not grounded on adultery, as reported by Time, Inc.; and stated flatly: "This is a flagrant example of 'journalistic negligence.'" 305 So. 2d 172, 178 (1974). It appears to me that the Florida Supreme Court has made a sufficiently "conscious determination," *ante,* at 463, of the fact of negligence. If it is *Gertz* that controls this case and if that decision is to be applied retroactively, I would affirm the judgment.

MR. JUSTICE MARSHALL, dissenting.

The Court agrees with the Supreme Court of Florida that the "actual malice" standard of *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), does not apply to this case. Because I consider the respondent, Mary Alice Firestone, to be a "public figure" within the meaning of our prior decisions, *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323 (1974); *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130 (1967), I respectfully dissent.

I

Mary Alice Firestone was not a person "first brought to public attention by the defamation that is the subject of the lawsuit." *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29, 78, 86 (1971) (MARSHALL, J., dissenting). On the contrary, she was "prominent among the '400' of

Palm Beach society," and an "active [member] of the sporting set," 271 So. 2d 745, 751 (Fla. 1972), whose activities predictably attracted the attention of a sizable portion of the public. Indeed, Mrs. Firestone's appearances in the press were evidently frequent enough to warrant her subscribing to a press-clipping service.

Mrs. Firestone brought suit for separate maintenance, with reason to know of the likely public interest in the proceedings. As the Supreme Court of Florida noted, Mr. and Mrs. Firestone's "marital difficulties were . . . well-known," and the lawsuit became "a veritable *cause celebre* in social circles across the country." *Ibid.* The 17-month trial and related events attracted national news coverage, and elicited no fewer than 43 articles in the Miami Herald and 45 articles in the Palm Beach Post and Palm Beach Times. Far from shunning the publicity, Mrs. Firestone held several press conferences in the course of the proceedings.

These facts are sufficient to warrant the conclusion that Mary Alice Firestone was a "public figure" for purposes of reports on the judicial proceedings she initiated. In *Gertz* v. *Robert Welch, Inc., supra,* at 352, we noted that an individual can be a public figure for some purposes and a private figure for others. And we found two distinguishing features between public figures and private figures. First, we recognized that public figures have less need for judicial protection because of their greater ability to resort to self-help: "public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." 418 U. S., at 344.

As the above recital of the facts makes clear, Mrs. Firestone is hardly in a position to suggest that she lacked access to the media for purposes relating to her lawsuit.

It may well be that she would have had greater difficulty countering alleged falsehoods in the national press than in the Miami and Palm Beach papers that covered the proceedings so thoroughly. But presumably the audience Mrs. Firestone would have been most interested in reaching could have been reached through the local media. In any event, difficulty in reaching all those who may have read the alleged falsehood surely ought not preclude a finding that Mrs. Firestone was a public figure under *Gertz*. *Gertz* set no absolute requirement that an individual be able fully to counter falsehoods through self-help in order to be a public figure. We viewed the availability of the self-help remedy as a relative matter in *Gertz*, and set it forth as a minor consideration in determining whether an individual is a public figure.

The second, "more important," consideration in *Gertz* was a normative notion that public figures are less deserving of protection than private figures: That although "it may be possible for someone to become a public figure through no purposeful action of his own," generally those classed as public figures have "thrust themselves to the forefront of particular public controversies" and thereby "invite[d] attention and comment." *Id.*, at 344–345. And even if they have not, "the communications media are entitled to act on the assumption that . . . public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." *Id.*, at 345.

We must assume that it was by choice that Mrs. Firestone became an active member of the "sporting set"—a social group with "especial prominence in the affairs of society," *ibid.*, whose lives receive constant media attention. Certainly there is nothing in the record to indicate otherwise, and Mrs. Firestone's subscription to a press-clipping service suggests that she was not altogether unin-

terested in the publicity she received. Having placed herself in a position in which her activities were of interest to a significant segment of the public, Mrs. Firestone chose to initiate a lawsuit for separate maintenance, and most significantly, held several press conferences in the course of that lawsuit. If these actions for some reason fail to establish as a certainty that Mrs. Firestone "voluntarily exposed [herself] to increased risk of injury from defamatory falsehood," surely they are sufficient to entitle the press to act on the assumption that she did. Accordingly, Mrs. Firestone would appear to be a public figure under *Gertz*.

The Court resists this result by concluding that the subject matter of the alleged defamation was not a "public controversy" as that term was used in *Gertz*. In part, the Court's conclusion rests on what I view as an understatement of the degree to which Mrs. Firestone can be said to have voluntarily acted in a manner that invited public attention. But more fundamentally its conclusion rests on a reading of *Gertz* that differs from mine. The meaning that the Court attributes to the term "public controversy" used in *Gertz* resurrects the precise difficulties that I thought *Gertz* was designed to avoid.

It is not enough for the Court that, because of Mrs. Firestone's acquired prominence within a segment of society, her lawsuit had already attracted significant public attention and comment when the Time report was published. According to the Court, the controversy, already of interest to the public, was "not the sort of 'public controversy' referred to in *Gertz*." *Ante,* at 454. The only explanation I can discern from the Court's opinion is that the controversy was not of the sort deemed relevant to the "affairs of society," *ante,* at 453, and the public's interest not of the sort deemed "legitimate" or worthy of judicial recognition.

If there is one thing that is clear from *Gertz,* it is that we explicitly rejected the position of the plurality in *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29 (1971), that the applicability of the *New York Times* standard depends upon whether the subject matter of a report is a matter of "public or general concern." We explained in *Gertz* that the test advanced by the *Rosenbloom* plurality

> "would occasion the . . . difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of 'general or public interest' and which do not—to determine, in the words of MR. JUSTICE MARSHALL, 'what information is relevant to self-government.' *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S., at 79. We doubt the wisdom of committing this task to the conscience of judges." 418 U. S., at 346.

Having thus rejected the appropriateness of judicial inquiry into "the legitimacy of interest in a particular event or subject," *Rosenbloom, supra,* at 78, 79 (MARSHALL, J., dissenting), *Gertz* obviously did not intend to sanction any such inquiry by its use of the term "public controversy." Yet that is precisely how I understand the Court's opinion to interpret *Gertz.*[1]

---

[1] The Supreme Court of Florida's explanation of why the *New York Times* standard is inapplicable is equally inconsistent with *Gertz.* After referring to Mrs. Firestone's prominence in Palm Beach society, the widespread attention her lawsuit received, and her granting of interviews to the news media, the court reasoned as follows:

"That the public was curious, titillated or intrigued with the scandal in the Firestone divorce is beyond doubt. But we again emphasize the distinction we make between that genre of public interest and real public or general *concern.*

". . . [W]e cannot find here any aspect of real public concern,

If *Gertz* is to have any meaning at all, the focus of analysis must be on the actions of the individual, and the degree of public attention that had already developed, or that could have been anticipated, before the report in question. Under this approach, the class of public figures must include an individual like Mrs. Firestone, who acquired a social prominence that could be expected to attract public attention, initiated a lawsuit that predictably attracted more public attention, and held press conferences in the course of and in regard to the lawsuit.[2] I would hold that, for purposes of this

and none has been shown to us, which would be furthered or enhanced by 'free discussion' and 'robust debate' about the divorce of Russell and Mary Alice Firestone.

"Nor did [Mrs. Firestone's] quoted interviews with the press raise the untidy affair to the dignity of true public concern. Unlike an actress who might grant interviews relating to the opening of her new play, [Mrs. Firestone] was not seeking public patronage. Publicity, or sympathy, perhaps, but not patronage. Irrespective of her subjective motives, objectively she was merely satiating the appetites of a curious press.

"In sum, the Firestone divorce action was unquestionably newsworthy, but reports thereof were not constitutionally protected as being matters of real public or general concern." 271 So. 2d, at 752.

This language is from an opinion that issued before *Gertz* was decided, but the reasoning was reaffirmed in the Supreme Court of Florida's final opinion in the case, 305 So. 2d 172, 174–175 (1974), which issued after our decision in *Gertz*.

[2] The Court places heavy emphasis on the degree to which Mrs. Firestone attempted to "influence the resolution of" a particular controversy. In response to the observation that Mrs. Firestone held press conferences, for example, the Court notes that those conferences were not intended to influence the outcome of the trial or any other controversy. *Ante*, at 454–455, n. 3. *Gertz* did, of course, refer to the fact that persons often become public figures by attempting to influence the resolution of public questions. 418 U. S., at 345. But the reference must be viewed as but an example of how one becomes a public figure. Surely *Gertz* did not intend

case, Mrs. Firestone is a public figure, who must demonstate that the report in question was published with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

## II

While the foregoing discussion is sufficient to dispose of the case under my reading of the law, two other aspects of the Court's opinion warrant comment. First, the Court appears to reject the contention that a rational interpretation of an ambiguous document is always entitled to some constitutional protection. The Court reads *Time, Inc.* v. *Pape,* 401 U. S. 279 (1971), as providing such protection only under the rubric of the *New York Times* "actual malice" standard. *Ante,* at 459 n. 4. I disagree. While the precise holding in *Pape* was that the choice of one of several rational interpretations of an ambiguous document is not enough to create a jury issue of "actual malice," the Court's reasoning suggests that its holding ought not be so confined. In introducing its discussion, the Court noted:

> "[A] vast amount of what is published in the daily and periodical press purports to be descriptive of what somebody *said* rather than of what anybody *did.* Indeed, perhaps the largest share of news concerning the doings of government appears in the form of accounts of reports, speeches, press conferences, and the like. The question of the 'truth' of

to establish a requirement that an individual attempt to influence the resolution of a particular controversy before he can be termed a public figure. If that were the rule, Athletic Director Butts in *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130 (1967), would not be a public figure. We held that Butts was a public figure, and in *Gertz* we specifically noted that that decision was "correct." 418 U. S., at 343.

such an indirect newspaper report presents rather complicated problems." 401 U. S., at 285–286 (emphasis in original).

And in discussing the need for some protection for the publisher attempting to report the gist of a lengthy government document, the Court observed:

> "Where the document reported on is so ambiguous as this one was, it is hard to imagine a test of 'truth' that would not put the publisher virtually at the mercy of the unguided discretion of a jury." *Id.*, at 291.

Surely the Court's evident concern that publishers be accorded the leeway to offer rational interpretations of ambiguous documents was not restricted to cases in which the *New York Times* standard is applicable. That concern requires that protection for rational interpretations be accorded under the fault standard contemplated in *Gertz*. Thus my Brothers POWELL and STEWART, while joining the opinion of the Court, recognize that the rationality of an interpretation of an ambiguous document must figure as a crucial element in any assessment of fault under *Gertz*. *Ante,* at 467–469. I agree. The choice of one of several rational interpretations of an ambiguous document, without more, is insufficient to support a finding of fault under *Gertz*.

Finally, assuming that the Court is correct in its assessment of the law in this case, I find the Court's disposition baffling. The Court quotes that portion of the Florida Supreme Court's opinion which, citing *Gertz*, states in no uncertain terms that Time's report was a "flagrant example of 'journalistic negligence.' " 305 So. 2d 172, 178 (1974). But the Court is unwilling to read that statement as a "conscious determination" of fault, and accordingly the Court remands the case for an assessment of fault.

Surely the Court cannot be suggesting that the quoted portion of the Supreme Court of Florida's opinion, which contained a citation to *Gertz,* had no meaning at all. And if it did have meaning, it must have reflected either an intention to find fault or an intention to affirm a finding of fault. It is quite clear that the opinion was not intended to affirm any finding of fault, for as the Court observes there was no finding of fault to affirm. The question of fault had not been submitted to the jury, and the District Court of Appeal had explicitly noted the absence of any proof that Time had been negligent. 254 So. 2d 386, 390 (1971). The absence of any prior finding of fault only reinforces what the Florida Supreme Court's language itself makes clear—that the court was not simply affirming a finding of fault, but making such a finding in the first instance.

I therefore agree with my Brother WHITE that the Supreme Court of Florida made a conscious determination of fault. I would add, however, that it is a determination that is wholly unsupportable. The sole basis for that court's determination of fault was that under Florida law a wife found guilty of adultery cannot be, as Mrs. Firestone was, awarded alimony. Time, the court reasoned, should have realized that a divorce decree containing an award of alimony could not, consistent with Florida law, have been based on adultery. But that reasoning assumes that judicial decisions can always be squared with the prior state of the law. If we need be reminded that courts occasionally err in their assessment of the law, we need only refer to the subsequent history of the divorce decree involved in this case: When the divorce case reached the Supreme Court of Florida, that court found that the divorce had been granted for lack of "domestication" and pointed out that that was not one of the statutory grounds for

divorce. *Firestone* v. *Firestone,* 263 So. 2d 223 (1972). Time's responsibility was to report accurately what the trial court did, not what it could or should have done. If the trial court awarded alimony while basing the divorce on a finding of adultery by the wife, Time cannot be faulted for reporting that fact. Unless there is some basis for a finding of fault other than that given by the Supreme Court of Florida, I think it clear that there can be no liability.