Filed 3/30/23 Olin v. Grace CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JEFFREY J. OLIN,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>ROGER M. GRACE et al.,<br><br>Defendants and Respondents. | F083969<br><br>(Super. Ct. No. VCU286243)<br><br>**ORDER MODIFYING OPINION**<br>[No Change in Judgment] |

**THE COURT:**

It is ordered that the opinion filed herein on March 30, 2023, be modified as follows:

On page 33, under the heading Disposition, add the following sentence at the end of the paragraph:

In the interests of justice, each party shall bear their own costs on appeal.

There is no change in the judgment.

PEÑA, J.

WE CONCUR:


LEVY, Acting P. J.


DETJEN, J.

Filed 3/30/23  Olin v. Grace CA5 (unmodified opinion)

**<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JEFFREY J. OLIN, | F083969 |
| Plaintiff and Appellant, | (Super. Ct. No. VCU286243) |
| v. | |
| ROGER M. GRACE et al., | **OPINION** |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Tulare County.  Nathan D. Ide, Judge.

Jeffrey J. Olin, in pro. per., for Plaintiff and Appellant.

Roger M. Grace, in pro. per., and for Defendants and Respondents.

-ooOoo-

Plaintiff Jeffrey J. Olin appeals from two orders and a judgment entered in favor of defendants Roger M. Grace, Jo-Ann W. Grace, Metropolitan News Company, and Grace Communications, Inc.  Specifically, Olin appeals from an order granting defendants' special motion to strike pursuant to Code of Civil Procedure section 425.16, an order granting the corporate defendants' motion for attorney fees, and the resulting

judgment. (Undesignated statutory references are to the Code of Civil Procedure.) This special motion to strike is commonly referred to as an anti-SLAPP motion (strategic lawsuit against public participation). We conclude the trial court properly granted the anti-SLAPP motion but erred in the award of attorney fees. We affirm in part, reverse in part, and direct the trial court to modify the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

**Factual Allegations of the Complaint**

**Alleged Defamatory Statements**

On March 10, 2021, Olin filed a complaint alleging as follows:

On or about March 11, 2020, Metropolitan News Company (MNC) published an article concerning Olin's prior appeal of a domestic violence restraining order (DVRO) issued to restrain him and protect his ex-spouse, Kelly Olin. (*In re Marriage of Olin* (Mar. 9, 2020, B295416) (nonpub. opn.) Second District Court of Appeal, Division Eight (the "DVRO appellate opinion").) The March 11, 2020 article read, in main part:

> "*Court of Appeal:*
> "**DVRO Can Be Based on Yelp Review of Ex-Wife, Email**
> "*Stratton's Opinion Does Not Discuss Whether Order, Based on Communications, Is Prior Restraint Against Like Speech*
>
> "By a MetNews Staff Writer
>
> "A Long Beach attorney who posted a denigrating review of his ex-wife on Yelp and sent an email threatening to bring various causes of action against her has failed to persuade the Court of Appeal for this district to lift an order that he not 'harass' his former spouse.
>
> "The five-year domestic violence restraining order ('DVRO') against Jeffrey J. Olin, an associate in the law firm of Ford Walker Haggerty & Behar, was upheld in an opinion by Justice Maria Stratton of Div. Eight. The opinion, filed Monday, was not certified for publication.
>
> "The opinion quotes Olin as insisting, in his email to his ex-wife, that he has 'a First Amendment Right to publish the Truth,' but does not discuss whether the ban on harassing her—which stems from the Yelp

2.

positing [*sic*] and the email—constitutes a prior restraint on communications of like nature.

### "Veasey's Order

"The DVRO, issued by Los Angeles Superior Court Commissioner Glenda Veasey, also provides that Olin may not 'attack, strike, threaten, assault …, hit, follow, stalk' or 'disturb the peace' of the ex-wife or their 14-year-old son. It bars contacting his former spouse, Kelly Rene Olin, or the son, and requires that he stay at least 100 yards away from them." *[Hereafter, we refer to this paragraph as the "alleged defamatory statement."]*

"An Oct. 2, 2018 'review' Jeffrey Olin posted on the Yelp page of his former wife's employer, Surf Management Inc., (since removed) said: [allegations against Olin's ex-spouse omitted.] [¶] … [¶]

### "Stratton's Opinion

"Stratton wrote:

"'Although Jeffrey may view his own behavior as "not vulgar", we believe contacting his ex-spouse's employer via email in the manner he did … and leaving reviews about his ex-spouse on her employer's Yelp page in the manner he did … amounts to abuse, harassment, and intentional disturbing of Kelly's peace, warranting the DVRO against him.

"'We further agree with the trial court's decision to issue the DVRO for a period of five years; it is noteworthy Jeffrey maintains to this day he "was justified" in sending the October 18, 2018 email to Kelly and her employer.' [¶] … [¶]

"The case is *In re the Marriage of Olin*, B295416."

Olin alleges the DVRO did not apply to Olin's minor son and is demonstrably false. He attached a copy of the DVRO to his complaint to support his allegation. It contains a section entitled "Additional Protected Persons" in which Olin's minor son is identified but the section is stricken and initialed by the commissioner who issued the DVRO.

Olin demanded MNC retract the alleged defamatory statement. Defendant Roger M. Grace (R. Grace), on behalf of MNC, denied the statement was false and

3.

"initially refused to take any remedial action after [Olin] provided him with the confidential first page of the … DVRO …." Olin alleges that R. Grace was "personally involved in the publication of the falsity" and that R. Grace asserted "he had emailed [Olin] for comment the day the … appellate opinion was filed."

Olin alleges MNC continued to publish the alleged defamatory statement by publishing an amended news article. The amended news article contained the following, prefatory boldface language:

> "**The article below is a report on a Court of Appeal opinion affirming the imposition of a [DVRO] on attorney Jeffrey Olin. The article says, in part:**
>
> "'**The DVRO, issued by Los Angeles Superior Court Commissioner Glenda Veasey, also provides that Olin may not "attack, strike, threaten, assault …, hit, follow, stalk" or "disturb the peace" of the ex-wife or their 14-year-old son. It bars contacting his former spouse, Kelly Rene Olin, or the son, and requires that he stay at least 100 yards away from them.'**
>
> "**Those provisions are reported by Court of Appeal Justice Maria E. Stratton of this district's Div. Eight in her March 9, 2020 opinion to have been included in a temporary DVRO, and she states that a permanent (five-year) order was later entered. Her opinion does not state that reference to the son was omitted from the permanent DVRO.**
>
> "**Nearly a year after the article was published, Olin has protested that the article is libelous, declaring that the permanent DVRO protects only his ex-wife, not the son. This was not inferable from the opinion. Olin was afforded a chance to comment on the opinion before it was reported upon and he did not avail himself of that opportunity.**
>
> "**The docket does not reflect a petition for rehearing.**
>
> "**We trust Olin is now content in having it made known that the DVRO, in its final form, only applied to his ex-wife.**
>
> "**The opinion can be found at https://www.courts.ca.gov/opinions/nonpub/B295416.DOC.**"

4.

Immediately following the above quoted prefatory language, the original MNC news article containing the alleged defamatory statement was set forth verbatim in the amended news article. Olin alleges this amended news article leaves the original article "unchanged and still includes the false statement, which [R. Grace] stubbornly, and maliciously, refuses to correct."

Olin alleges that R. Grace indicated he would assert that the alleged defamatory statement is a "privileged communication protected by Civil Code section 47(d)(1)" and would "file an anti-SLAPP motion, pursuant to Code of Civil Procedure section 425.16"; that R. Grace's assertion the alleged defamatory statement is privileged is incorrect; and that Olin is "a private figure and this [is] … a private matter." In his allegations, Olin clarified he "is only objecting to the defendants having created and published this false statement [i.e., the alleged defamatory statement], and is not addressing the remainder of the [news] 'article.'"

Olin alleges he communicated to R. Grace that, while other sites have published articles concerning Olin's appeal of the DVRO, "[R. Grace's] website is the only one to fabricate and publish the false statement that a [DVRO] prevents [Olin] from contacting his son."

**The Relationship Between Defendants**

Olin alleges defendants R. Grace and Jo-Ann W. Grace (J. Grace) are married, licensed California attorneys, and are the owners of defendant MNC and its parent company, defendant Grace Communications, Inc. (GCI). Olin further alleges R. Grace is "the registered Chief Executive Officer of [MNC] and the Chief Financial Officer of GCI" and that J. Grace "is the Secretary, Chief Financial Officer, and Director of [MNC] as well as the Chief Executive Officer of GCI." He also alleges each of the named defendants are "alter egos of each other and … [are] jointly and severally liable for the tortious acts alleged" in the complaint; that MNC and GCI are undercapitalized and

5.

"completely commingled"; that there is no "proper arms-length relationship" between MNC, GCI, and the Grace defendants; and that MNC and GCI "are mere shells for the benefit of" the Grace defendants.

### Additional Allegations and Causes of Action in the Complaint

Olin filed suit alleging two causes of action against all defendants: (1) the first cause of action for defamation, per se; and (2) a second cause of action for portraying Olin in a false light. Olin alleges defendants' actions were done "with the intent to cause [him] injury"; their actions were "despicable"; and they "acted with willful and knowing disregard" of Olin's rights and "with the awareness of the probable harmful consequences of their conduct." Olin alleges defendants "deliberately failed to avoid those consequences" thereby subjecting him to "cruel and unjust hardship."

### *First Cause of Action for Defamation, Per Se*

Olin alleges in his first cause of action for defamation, per se, that the alleged defamatory statement was published on the Internet by MNC; that the news article clearly indicates it is about Olin; that the DVRO appellate opinion does not reflect the information in the alleged defamatory statement and that the statement was fabricated by defendants; and that defendants "failed to use reasonable care to determine the truth or falsity of the [alleged] defamatory statement."

Olin further alleges the alleged defamatory statement "injured [Olin's] personal and professional reputations and has inflicted emotional distress upon him." For example, Olin alleges, after being laid off in July 2020 as a result of the COVID-19 pandemic, he "has been unable to get more than a handful of interviews and those never proceed beyond the first interview." Olin alleges "he began to wonder why he was not getting responses." Then he Googled "Jeffrey Olin attorney" and discovered defendants' news article was the first link to show in the results. He alleges "[e]very potential employer he has been applying to … has been given the false impression that [he] has to

6.

be prevented from contacting his own son. All of his potential employers have been given the false impression that after a hearing, [he] was determined to have engaged in actions which showed him to be a threat to his own son."

Finally, Olin alleges defendants should be held to a "heightened understanding of the law and the harm that would result from their reckless" reporting due to the fact the Grace defendants are both seasoned attorneys and "are co-publishers of a legal affairs publication."

### *Second Cause of Action for False Light*

Olin relies on all of the aforementioned allegations for his second cause of action. He further alleges MNC's news articles "publicly disclosed information that portrayed [him] in a false light"; "[t]he false light created by the disclosure would be highly offensive to a reasonable person"; the evidence is clear and convincing that "[d]efendants acted with a reckless disregard for the truth"; defendants "intended to cause [him] emotional distress" that he "suffered and continues to suffer" from as a result of their conduct; and he has been "unable to obtain employment since being portrayed in this false light."

## The Special Motion to Strike, Motion for Attorney Fees, Resulting Judgment, and Olin's Appeal

### The Special Motion to Strike

On August 17, 2021, defendants moved for an order striking Olin's complaint without leave to amend pursuant to section 425.16 (i.e., the anti-SLAPP motion) and for an award of attorney fees and costs. The stated grounds for the motion were that "the action arises from acts in furtherance of … defendants' right of free speech in connection with a public issue" and that Olin "cannot demonstrate a probability of prevailing on the merits." Defendants asserted the acts underlying Olin's causes of action fell within three categories of protected activity under subdivision (e) of section 425.16. Specifically, defendants contend their reporting was a "written or oral statement or writing made in

7.

connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" (§ 425.16, subd. (e)(2)); a "written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest" (*id.*, subd. (e)(3)); and "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest" (*id.*, subd. (e)(4)).

On August 30, 2021, Olin opposed the motion and made a counter request for sanctions in the amount of $2,400. Defendants filed their reply to Olin's opposition on September 3, 2021.

On September 13, 2021, the trial court adopted its tentative ruling to grant defendants' motion to strike and deny defendants' request for attorney fees and costs without prejudice to defendants' right to bring a "subsequent noticed motion concerning their fees." The court found defendants' article drew "exclusively on content from the [DVRO] appellate opinion" and determined it met the criteria set forth in subdivision (e)(2) of section 425.16 ("any written or oral statement or writing made in connection with an issue under consideration … by a … judicial body"). The court then found Olin did not meet his burden of demonstrating "a probability of prevailing on the claim by making a prima facie showing of facts that would, if proved, support a judgment in [Olin's] favor." In particular, the court found Olin did not "establish[] a probability of overcoming an absolute defense asserted by defendants under Civil Code section 47(d)(1)," which provides: "A privileged publication or broadcast is one made: [¶] … [¶] (d)(1) By a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof, or (E) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant has been issued."

8.

**The Motion for Attorney Fees**

On October 7, 2021, defendants MNC and GCI moved for an order awarding them their attorney fees and costs. The motion was made pursuant to section 425.16, which, subject to exceptions, entitles a prevailing party defendant to recoup its attorney fees and costs. (§ 425.16, subd. (c)(1).) On November 5, 2021, Olin opposed the motion.

On November 24, 2021, Olin filed a document entitled "Plaintiff's Opposition to Tentative Ruling" in which Olin argued the trial court's tentative ruling on the motion for attorney fees was contrary to law. A copy of the tentative ruling was not included in the record on appeal.

On November 29, 2021, defendants MNC and GCI filed a "Supplemental Memorandum of Points and Authorities in Support of Defendants' Motion for Attorney Fees" in which MNC and GCI requested "the supplemental memorandum be received and considered in place of argument at the time of the Dec. 1 hearing," and a declaration from R. Grace. As part of his declaration, R. Grace attached a copy of MNC's and GCI's "Reply to Opposition to Motion for Attorney Fees"; averred the reply was e-mailed to Olin and the trial court's research attorney on November 8, 2021; averred the reply was sent that same day via "next-day delivery" to the court but the court's "online register of actions does not reflect" the document as having been filed.

On December 13, 2021, the trial court issued its "Ruling on Defendants' Motion for Attorneys' Fees" in which it granted the motion and awarded MNC and GCI fees in the amount of "$3,000.00 for work performed on behalf of the corporate defendants only and costs of $465.00."

**The Judgment and Olin's Appeal**

On December 15, 2021, judgment was rendered in favor of defendants. It reads: "Whereas, on Sept. 13, 2021, the defendants' special motion to strike, pursuant to … [section] 425.16, for the reasons set forth in the order [*sic*]; and [¶] Whereas defendants [GCI] and [MNC] have moved for an order awarding attorney fees, and no opposition

9.

[*sic*] having been filed, and good cause having been shown for such an award[; ¶] IT IS HEREBY ORDERED, ADJUDGED AND DECREED that plaintiff … shall take nothing by his complaint and shall pay to defendants, jointly and severally, $3,000 in attorney fees and $456 in costs."

On February 16, 2022, Olin filed his notice of appeal.

## DISCUSSION

### I.     The Orders and Judgment at Issue Are Appealable and the Notice of Appeal Was Timely

An appellate court has "an independent obligation in this as in every matter to confirm whether jurisdiction exists." (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 252.)  During the pendency of this appeal, defendants filed a motion to dismiss the appeal on grounds Olin's notice of appeal was untimely.  The motion to dismiss was subsequently withdrawn.  We have independently reviewed the record and conclude Olin's notice of appeal was timely, and thus confirm our jurisdiction to proceed to the merits of the issues raised by Olin.

### II.     Standard of Review for the Order Granting Defendants' Anti-SLAPP Motion

"'Review of an order granting or denying a motion to strike under section 425.16 is de novo.  [Citation.]  We consider "the pleadings, and supporting and opposing affidavits … upon which the liability or defense is based."  (§ 425.16, subd. (b)(2).)  However, we neither "weigh credibility [nor] compare the weight of the evidence.  Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.""  (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325–326.)

### III.     Anti-SLAPP Motion Purpose and Procedure

"[S]ection 425.16 was enacted in 1992 to dismiss at an early stage nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue.  [Citation.]  These meritless suits,

10.

referred to under the acronym SLAPP, … are subject to a special motion to strike unless the person asserting that cause of action establishes by pleading and affidavit a probability that he or she will prevail." (*Sipple v. Foundation For Nat. Progress* (1999) 71 Cal.App.4th 226, 235 (*Sipple*); see § 425.16, subd. (b)(1).)

Subdivision (a) of section 425.16 provides: "The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly."

Subdivision (b)(1) of section 425.16 provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

For purposes of section 425.16, an "'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right

of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

"Litigation of an anti-SLAPP motion involves a two-step process. First, 'the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged.' [Citation.] Second, for each claim that does arise from protected activity, the plaintiff must show the claim has 'at least "minimal merit."' [Citation.] If the plaintiff cannot make this showing, the court will strike the claim." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009.)

### A. The First Prong of the Anti-SLAPP Process Was Met by Defendants

#### 1. *Olin's Contention the DVRO Appellate Opinion Did Not Concern a Public Issue Is Without Merit*

Olin asserts the trial court erred in finding the first prong of the anti-SLAPP process was met for four reasons. He contends (1) defendants' reporting did not concern a public issue—relying on *Time*, *Inc. v. Firestone* (1976) 424 U.S. 448 (*Time*); (2) the DVRO appellate opinion indicated it was "not to be published in the official reports"; (3) the statement that the permanent DVRO protects Olin's son is a "fabricated statement, not part of the official record, and therefore should not be considered having been made in connection with a public proceeding"; and (4) defendants' reporting contains "an incorrect presumption made … and published by [defendants] without any fact-verification" and is "on all four tires with" the United States Supreme Court's holding in *Time*.

In *Time*, the publisher of Time magazine appealed a libel judgment against it based on a report it made concerning "the result of domestic relations litigation" between a husband who was the scion of a wealthy industrial family and his wife. (*Time*, *supra*, 424 U.S. at pp. 449–450.) During the couple's separation, the wife filed a complaint in a Florida state court seeking separate maintenance. (*Id*. at p. 450.) The husband

12.

"counterclaimed for divorce on grounds of extreme cruelty and adultery." (*Ibid*.)  In granting the divorce, the trial court noted the parties' competing allegations of infidelity and promiscuity and indicated it was "inclined to discount much of this testimony as unreliable" but that "neither party is domesticated, within the meaning of that term as used by the Supreme Court of Florida …." (*Id.* at pp. 450–451.)  Time magazine reported the court granted the couple's divorce "on grounds of extreme cruelty and adultery." (*Id.* at p. 452.)  When Time magazine refused to retract the story, the (now former) wife sued and obtained a libel judgment against the magazine.  (*Id*. at p. 452.)

Time magazine appealed the libel judgment against it, arguing, among other things, that the judgment should be reversed because the husband was a public figure, and the ex-wife did not demonstrate Time magazine had acted with actual malice as required under the holding of *New York Times v. Sullivan* (1964) 376 U.S. 254.  (*Time*, *supra*, 424 U.S. at pp. 452–453.)  Time magazine also argued its article "constituted a report of a judicial proceeding, a class of subject matter which … deserves the protection of the 'actual malice' standard even if the story is proved to be defamatorily false or inaccurate." (*Id.* at p. 453.)  The high court rejected both arguments.  (*Ibid*.)

The *Time* court noted it had "defined the meaning of 'public figure' for the purposes of the First and Fourteenth Amendments [as follows]:  [¶] 'For the most part those who attain this status have assumed roles of especial prominence in the affairs of society.  Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes.  More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.'" (*Time*, *supra*, 424 U.S. at p. 453, citing *Gertz v. Robert Welch*, *Inc*. (1974) 418 U.S. 323, 345.)

The *Time* court noted the ex-wife "did not assume any role of especial prominence in the affairs of society, other than perhaps Palm Beach society, and she did not thrust herself to the forefront of any particular public controversy in order to influence the

13.

resolution of the issues involved in it." (*Time*, *supra*, 424 U.S. at p. 453.) "Dissolution of a marriage through judicial proceedings is not the sort of 'public controversy' referred to in *Gertz*, even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public. Nor did [the ex-wife] freely choose to publicize issues as to the propriety of her married life. She was compelled to go to court by the State in order to obtain legal release from the bonds of matrimony. We have said that in such an instance '(r)esort to the judicial process … is no more voluntary in a realistic sense than that of the defendant called upon to defend his interests in court.'" (*Time*, *supra*, 424 U.S. at p. 454.) The *Time* court concluded the ex-wife "was not a 'public figure' for the purpose of determining the constitutional protection afforded [Time magazine's] report of the factual and legal basis for her divorce." (*Id.* at p. 455.)

The *Time* court noted that Time magazine's report was inaccurate because the grounds for the trial court granting the divorce was not that the ex-wife had been guilty of extreme cruelty and adultery—rather, it was based on "'lack of domestication of the parties,' a ground not theretofore recognized by Florida law. The [Florida] Supreme Court nonetheless affirmed the [divorce] judgment … because the record contained sufficient evidence to establish the ground of extreme cruelty." (*Time*, *supra*, 424 U.S. at pp. 458–459.)

As stated by the court in *Time*, Time magazine "may well argue that the meaning of the trial court's decree was unclear, but this does not license it to choose from among several conceivable interpretations the one most damaging to [the ex-wife]. Having chosen to follow this tack, [Time magazine] must be able to establish not merely that the item reported was a conceivable or plausible interpretation of the decree, but that the item was factually correct. We believe there is ample support for the jury's conclusion, affirmed by the Supreme Court of Florida, that this was not the case. There was, therefore, sufficient basis for imposing liability upon [Time magazine] if the constitutional limitations we announced in *Gertz* have been satisfied. These are a

14.

prohibition against imposing liability without fault, [citation], and the requirement that compensatory awards 'be supported by competent evidence concerning the injury.'" (*Time*, *supra*, 424 U.S. at p. 459, fns. omitted.)

In arguing that defendants failed to satisfy the first prong of the anti-SLAPP process, i.e., that defendants' publication of the alleged defamatory statement was not an "'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue'" as defined in subdivision (e) of section 425.16, Olin contends his "right to seek redress for the [alleged] defamatory statement about him is just as compelling as the [d]efendants' First Amendment [r]ight" and that the *Time* decision "expressly refutes that all judicial proceedings should matter equally with regard to First Amendment protections for reporting"; "that family matters … should be given different consideration than other types of judicial proceedings"; and that "California has been violating the rights of its residents by treating all judicial proceedings the same." Olin does not elaborate further on any of the aforementioned contentions. For reasons discussed below, we disagree.

First, we note that *Time* did not concern or address California's anti-SLAPP statute or procedure or any similar statute or procedure. Second, *Time*'s discussion of whether the domestic relations matter was a public controversy and whether the ex-wife in *Time* was a public figure was in the context of whether Time magazine could be held liable for defamation without a showing of "actual malice." (*Time*, *supra*, 424 U.S. at pp. 453–456.) In the case before us, defendants have not, and do not, contend they cannot be held liable for alleged defamation on grounds Olin is unable to establish actual malice. Thus, the holding in *Time* is not applicable here.

Third, California has defined the phrase "'act in furtherance of a person's right of petition or free speech … in connection with a public issue'" to include "(2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding

15.

authorized by law ….” (§ 425.16, subd. (e)(2).) Here, it is beyond dispute that the alleged defamatory statement was “written” and reported on “an issue under consideration or review by a … judicial body.” The only question which remains to determine whether the first prong of section 425.16 was met is whether the alleged defamatory statement was “made in connection with” the domestic relations matters before the appellate court that issued the DVRO appellate opinion. (*Id*., subd. (e)(2).) We conclude it was.

In *Sipple*, a defendant news magazine published an article concerning a prior custody dispute between the plaintiff and his first ex-wife, and alleged abuse suffered by the plaintiff’s first and second ex-wives. (*Sipple*, *supra*, 71 Cal.App.4th at pp. 230–231.) The plaintiff sued the defendant news magazine for libel, interference with contract, and intentional interference with prospective economic advantage. (*Id*. at p. 231.) The defendant news magazine then filed an anti-SLAPP motion. (*Ibid*.) In response, the plaintiff argued “his treatment of his previous wives is not a public issue and that the trial court erred in finding the article came within the protection of anti-SLAPP legislation.” (*Id*. at p. 236.)

The *Sipple* court noted “the California Supreme Court held that a defendant making a motion to strike under section 425.16, subdivision (e)(1) and (2) *need not separately demonstrate that the statement concerned an issue of public significance*…. [I]n crafting the statute, the Legislature equated a ‘public issue’ with the authorized official proceeding to which it connects.” (*Sipple*, *supra*, 71 Cal.App.4th at pp. 236–237, italics added, citing *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1118 (*Briggs*).) Or, as the trial court aptly stated, “[Olin] misapprehends subdivision (e)(2) to require the existence of a matter of public concern beyond that of the judicial proceeding itself.”

In *Briggs*, the California Supreme Court analyzed subdivision (e)(1) and (2) of section 425.16 and expressly disapproved of the holding in *Zhao v. Wong* (1996) 48

16.

Cal.App.4th 1114, which stated "'a lawsuit qualifies as a SLAPP suit only if it challenges a statement made in connection with a *public* issue made in an official proceeding or a statement made in connection with a *public* issue under review in an official proceeding.'" (*Briggs*, *supra*, 19 Cal.4th at p. 1113.) *Briggs* further noted the Legislature, in 1997, likewise rejected *Zhao*'s analysis in enacting subdivision (a) of section 425.16, which expressly states, "[T]his section shall be construed broadly." (See *Briggs*, at p. 1114.)

Subdivision (e)(1) and (2) of section 425.16 "'safeguard[s] free speech and petition conduct aimed at advancing self government, as well as conduct aimed at more mundane pursuits. Under the plain terms of the statute it is the context or setting itself that makes the issue a public issue: all that matters is that the First Amendment activity take place in an official proceeding or be made in connection with an issue being reviewed by an official proceeding.'" (*Sipple*, *supra*, 71 Cal.App.4th at p. 237, quoting with approval *Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036, 1047.) Thus, news articles reporting on such proceedings are "within the public issue definition." (*Sipple*, at p. 237; accord, *Braun*, at pp. 1048–1049; *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 863 [newspaper articles reporting on disputes between neighbors and a university over the university's decision to open its property to the homeless and related hearings by the county board of supervisors and related lawsuits are writings "'made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law'"].)

Here, MNC's reporting on the contents of the DVRO appellate opinion falls squarely within the language of subdivision (e)(2) of section 425.16 as interpreted by *Briggs* and *Sipple*.

17.

## 2. *Olin's Contention the DVRO Appellate Opinion Indicated It Was Not to be Published in the Official Reports Is Not Relevant*

Olin noted the DVRO appellate opinion indicates the opinion was "not to be published in the official reports" (boldface and capitalization omitted). He then cites to California Rules of Court, rule 8.1115(a), which provides: "Except as provided in (b), an opinion of a California Court of Appeal … that is not certified for publication or ordered published must not be cited or relied on by a court or a party in any other action." Without any analysis of how this rule of court is relevant to the matter on appeal, Olin posits the following question: "How is it [i.e., the DVRO appellate opinion] both an officially reported judicial proceeding and an expressly non-officially reported judicial proceeding?"

We fail to appreciate Olin's argument. The rule of court merely provides that other California courts and litigants in those courts may not cite or rely on the opinion. It has no effect on a news organization's ability to report on matters adjudicated by way of an appellate opinion that is not published in the Official Reports. And Olin makes no attempt to explain his point in his opening brief. "The absence of cogent legal argument … allows this court to treat the contention[] as waived." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.) Olin has forfeited his argument concerning the publication status of the DVRO appellate opinion.[1]

_____

[1] In his reply brief, Olin does attempt to explain his contention that the publication status of the DVRO appellate opinion precludes defendants from meeting the first prong of the anti-SLAPP process. "'Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument.' … '"Hence the rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before."'" (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.) Here, although Olin made mention of the issue in his opening brief, he provided no argument to which defendants could appropriately respond.

In reviewing his reply argument, it appears Olin is contending that, because the DVRO appellate opinion was not published in the Official Reports, the matter was not an official proceeding. (We glean this *implied* position from Olin's statement in his reply brief that "[t]he SLAPP statute expressly only protects official proceedings." Olin provides no citation to

18.

Notwithstanding, we think it appropriate to point out (as defendants did) that opinions not slated for publication in the Official Reports are nonetheless published—both on the Judicial Council Web site at https://www.courts.ca.gov/opinions-nonpub.htm and on Westlaw and Lexis. "[D]epublished and unpublished decisions are now as readily available as published cases, thanks to the Internet and technologically savvy legal research programs." (*People v. Williams* (2009) 176 Cal.App.4th 1521, 1529.)

### 3. *Olin's Remaining Arguments Do Not Alter Our Opinion that the First Prong of the Anti-SLAPP Procedure Was Met by Defendants*

Olin argues "it is not a part of any record that the [p]ermanent DVRO protects [Olin's son]. As it is a fabricated statement, not part of the official record, and therefore should not be considered having been made in connection with a public proceeding." Olin further argues defendants' reporting contains "an incorrect presumption made … and published by [defendants] without any fact-verification" and is "on all four tires with" the United States Supreme Court's holding in *Time*.

Aside from the above statements, Olin provides no argument, analysis, or citation to authority to demonstrate why an error in reporting on a court proceeding places the reporting outside the scope of subdivision (e)(2) of section 425.16. We are not persuaded. In our view, these contentions are more appropriately considered in connection with an analysis of the second prong of the anti-SLAPP procedure—i.e., whether Olin's claims of defamation and false light have "'at least "minimal merit."'" (*Bonni v. St. Joseph Health System*, *supra*, 11 Cal.5th at p. 1009.)

We have already determined defendants' reporting meets the criteria of subdivision (e)(2) of section 425.16. Olin's contentions set forth in the preceding paragraph do not alter that conclusion.

---

authority for any contention that the DVRO proceedings were not official. That such proceedings are official proceedings is not debatable and requires no citation to authority.

19.

**B.    The Second Prong of the Anti-SLAPP Process Was Not Met by Olin**

The second prong of the anti-SLAPP process is obtained from the final clause of section 425.16, subdivision (b)(1). That subdivision reads, in its entirety: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (*Ibid*.)

Having determined defendants met the first prong of the anti-SLAPP procedure, the burden shifted to Olin to "establish[] that there is a probability [he] will prevail on the claim"—i.e., that his causes of action have "'at least "minimal merit."'" (*Bonni v. St. Joseph Health System*, *supra*, 11 Cal.5th at p. 1009 ["[F]or each claim that does arise from protected activity, the plaintiff must show the claim has 'at least "minimal merit"'"].) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute— i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.) "[T]he statute poses no obstacle to suits that possess minimal merit." (*Id*. at p. 93.)

The trial court found Olin "does not have a probability of establishing, based on the facts presented, that the deviation in the article is of such a substantial character that it produces a different effect on the reader. The substance of the [DVRO appellate opinion] is described accurately [in the MNC news article], and the privilege under Civil Code section 47(d)(1) therefore unquestionably applies."

Subdivision (d)(1) of Civil Code section 47 provides: "A privileged publication or broadcast is one made: [¶] … [¶] (d)(1) By a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof, or (E) of a verified charge or

20.

complaint made by any person to a public official, upon which complaint a warrant has been issued."

In *Sipple*, the court, having determined a news magazine's reporting on a prior custody dispute pending in the courts met the first prong of Code of Civil Procedure section 425.16, considered whether the privilege conferred by Civil Code section 47, subdivision (d) applied. (*Sipple*, *supra*, 71 Cal.App.4th at pp. 240–246.) The court noted subdivision (d) of Civil Code section 47 has been construed broadly by courts of this state and declined the plaintiff's invitation to stray from this precedent. (*Id*. at pp. 240–241.) "[S]ubstantial public concerns implicated in Civil Code section 47, subdivision (d) support the extension of a broad protection over the media." (*Id.* at p. 241.)

"The meaning of a 'fair and true report' is well established in California case law. It is undenied that a media defendant does not have to justify every word of the alleged defamatory material that is published. [Citation.] The media's responsibility lies in ensuring that the 'gist or sting' of the report—its very substance—is accurately conveyed. [Citation.] Moreover, this responsibility carries with it a certain amount of literary license. The reporter is not bound by the straitjacket of the testifier's exact words; a degree of flexibility is tolerated in deciding what is a 'fair report.'" (*McClatchy Newspapers*, *Inc. v. Superior Court* (1987) 189 Cal.App.3d 961, 975–976 (*McClatchy*).)

Here, there is no dispute as to the content of MNC's news article and its amended news article. Likewise, there is no dispute as to the content of the DVRO appellate opinion that MNC was reporting on. Under such circumstances, courts have decided privilege issues under Civil Code section 47 as a matter of law. (*McClatchy*, *supra*, 189 Cal.App.3d at p. 976, citing *Kilgore v. Younger* (1982) 30 Cal.3d 770, 777; *Jennings v. Telegram-Tribune Co.* (1985) 164 Cal.App.3d 119, 127; and *Grillo v. Smith* (1983) 144 Cal.App.3d 868, 873–874.)

Olin contends the alleged defamatory statement "alters the gist and sting of the [DVRO appellate opinion] because it falsely implies that when the permanent DVRO was

21.

granted Olin was found to be a child abuser." (Underscoring and some capitalization omitted.) Olin argues (we believe correctly) he was never found to be a danger to his son. Olin argues the alleged defamatory statement "clearly changes … the allegations against [him]" and that "[t]here is no indication anywhere else but in the [d]efendants' fabricated statement that the [p]ermanent DVRO included [Olin's son]." He further contends "[t]he restraining order process is intended to be understood by laymen and jurors would understand that a [p]ermanent DVRO means that an evidentiary hearing was held and that a [t]emporary DVRO is a very different thing—and that so long as the allegations alone suggest that there would be a danger to a requested party, the [t]emporary [r]estraining [o]rder will be granted, until the hearing."

The parties do not dispute the permanent DVRO did not include Olin's son as a protected individual. Defendants contend, however, they did not know this until Olin provided them a copy of the permanent DVRO, and the "statement that the DVRO applied to Olin's son was a *factual* error. However, it was not a *reporting* error. It was a fair inference—if not the only reasonable inference that could be drawn—from the [DVRO appellate] opinion reported upon." As such, defendants contend the trial court correctly determined the MNC news article (including the alleged defamatory statement therein) is privileged under Civil Code section 47, subdivision (d).

In order to determine whether MNC's reporting qualifies as privileged under Civil Code section 47, subdivision (d), we have reviewed and compared the DVRO appellate opinion and the alleged defamatory statement contained in the MNC articles. (For convenience and clarity only, we refer to Olin's ex-spouse as Kelly.) The DVRO appellate opinion recounts the following facts and allegations of fact by Olin and Kelly in the proceedings that led to the issuance of the permanent DVRO and that we consider relevant to the "gist or sting" of the DVRO appellate opinion: (1) Kelly filed the subject "DVRO request against [Olin], listing herself and [their son] as persons to be protected"; (2) Olin "'dumped' all of their minor child['s] … belongings in front of [Kelly's] garage

22.

door, in direct view of [the child's] bedroom window"; (3) Kelly requested the family court commissioner to order (a) Olin "cannot '[h]arass, attack, strike, threaten, assault …, hit, follow, stalk, … disturb the peace' of Kelly and [their son]'"; (b) Olin "cannot '[c]ontact [Kelly or [their son]], either directly or indirectly, in any way'; and (c) Olin "shall stay at least 100 yards away from Kelly and her home, place of work, and vehicle, and from [their son] and the school he attends"; (4) the family court commissioner issued a temporary DVRO against Olin "ordering him to stay 'at least 100 yards away' from Kelly … and from [their son] and the school he attends"; (5) Olin requested a DVRO against Kelly upon allegations which included (a) "'[Kelly] caused my 12-year-old son to *cheat* on me with another father in secret (which is why it was "cheating") for three months[,]'" (underscoring and boldface omitted); (b) "problems began … when [Olin] found that [his] son had been *cheating* on [him] for at least three months" (underscoring and boldface omitted) and his son "told [Olin] that his mother had told him to keep all knowledge of the man's existence from [him] and that [his] son had willingly done so" (underscoring and boldface omitted); and (c) Kelly "had already demolished [his] fatherhood"; (6) "his son … 'no longer has a home' with [Olin], so it made 'no sense for [Olin] to have [his son's] property' at his house"; (7) during the course of proceedings but prior to Kelly filing her request for the subject DVRO, the family court commissioner noted Olin filed a document "'indicating that he wants *no visitation* with the minor child and … that the child is a clear and present danger to his security and safety'" (italics added by the court in the DVRO appellate opinion); (8) the family court commissioner criticized Olin with the comment, "'Your legal position—for example, you say that you're angry with [Kelly], because you say that she has caused your 12-year-old child to cheat on you, because she has a gentleman in her life. [¶] And I don't know what the relationship between the gentleman in her life and your son is, but a child can't cheat on you. To state—as an attorney, to state that "she has caused my 12-year-old child to cheat on me," and then to send letters and e–mail messages—page-and-a-half-long letters and

23.

e-mail messages, not only to her, but to the 12-year-old child, calling him a lying, deceitful—and telling the court that having contact with your 12-year-old child is a danger to you and your job, and therefore, you want no contact with your child ever again …"; and (9) the family court commissioner "found issuance of Kelly's requested restraining order against [Olin] both 'necessary and appropriate.' The DVRO was effective for five years."

We have been unable to find any reference in the DVRO appellate opinion that would suggest the permanent DVRO differed from the temporary DVRO that issued except as to their duration. Importantly, Olin does not reference any statement in the DVRO appellate opinion to suggest otherwise. The opinion noted Kelly requested the family court commissioner issue a DVRO that would protect both her and their son, that the commissioner found Kelly's requested order " both 'necessary and appropriate,'" and that the DVRO was granted. Moreover, the tenor of the DVRO appellate opinion suggests Olin's relationship with his son had deteriorated to a point where Olin expressed anger, resentment, and disapproval of his son, and of not wanting any visitation rights. Although the DVRO appellate opinion was obviously imprecise in its description of the permanent DVRO that issued, the facts recited in the opinion leave no room for an inference that the permanent DVRO did not protect Kelly and their son.

Olin argues the MNC article impliedly and wrongfully brands him a child "abuser." In fact, the Domestic Violence Prevention Act (DVPA) (Fam. Code § 6200 et seq.) authorizes a court to "issue a protective order "'to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved' upon 'reasonable proof of a past act or acts of abuse.'"'" (*Curcio v. Pels* (2020) 47 Cal.App.5th 1, 11.) "Abuse[, however,] is not limited to the actual infliction of physical injury or assault" under the DVPA. (Fam. Code § 6203, subd. (b).) Conduct that might lead to the issuance of a DVRO includes "'disturbing the peace of the other party' ([Fam. Code,] § 6320, subd. (a)), which 'may be

24.

properly understood as conduct that destroys [another's] mental or emotional calm.'" (*Curcio*, at p. 11.) Such conduct "may be committed directly or indirectly." (Fam. Code § 6320, subd. (c).) The facts and allegations of fact described in the DVRO appellate opinion—whether true or not—which, by all appearances, led to the issuance of the permanent DVRO might well lead a reader of the opinion to conclude Olin's activity met this broad definition of "abuse." That MNC's reporting (which made no express allegation of such conduct) might do the same is a natural, albeit regrettable, consequence of a fair and true report of the opinion.

The DVRO appellate opinion was extremely critical of Olin and his stated position toward his son. MNC's articles did not alter the gist or sting of the DVRO appellate opinion. We conclude, as a matter of law, MNC's articles were a "fair and true report" of the contents of the DVRO appellate opinion as that phrase is used in subdivision (d)(1) of Civil Code section 47, and we affirm the court's order granting defendants' special motion to strike under Code of Civil Procedure section 425.16.

## IV.    Attorney Fee Issues

### A.    Standard of Review

Olin contends the facts relevant to the attorney fee award rendered by the trial court are undisputed. We agree. Where the facts relevant to a trial court's award of attorney fees are undisputed, an appellate court "review[s] the legal basis for an attorney fee award de novo." (*People ex rel. Dept. of Corporations v. Speedee Oil Change Systems, Inc.* (2007) 147 Cal.App.4th 424, 428.) However, "ascertaining the fee amount is left to the trial court's sound discretion." (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1321.) Thus, we review the trial court's determination that the corporate defendants were entitled to an award of attorney fees de novo but review the amount of the award for abuse of discretion.

25.

**B. The Trial Court Erred in Granting the Corporate Defendants' Motion for Attorney Fees**

Olin contends the trial court erred in awarding defendants MNC and GCI attorney fees because (1) they were represented by fellow defendant R. Grace who, along with his spouse, defendant J. Grace, are the sole owners of MNC and GCI, and (2) R. Grace is not an independent third-party in-house counsel and is representing his own interests.

Subject to exceptions not relevant here, subdivision (c)(1) of section 425.16 provides that "a prevailing defendant on a special motion to strike shall be entitled to recover that defendant's attorney's fees and costs.…" The case law on who may recoup attorney fees and under what conditions is extensive. We examine some relevant cases below.

In *Trope v. Katz* (1995) 11 Cal.4th 274 (*Trope*), a law firm sued to enforce a contract containing an attorney fee provision against a nonpaying client. (*Id.* at pp. 277–278.) The law firm represented itself in the litigation and obtained a judgment in its favor. (*Id.* at p. 278.) However, the trial court denied the law firm its request for attorney fees and the court of appeal affirmed. (*Ibid.*) The matter made its way to our state Supreme Court, which held that "an attorney who chooses to litigate in propria persona and therefore does not pay or become liable to pay consideration in exchange for legal representation cannot recover 'reasonable attorney's fees' under [Civil Code] section 1717 as compensation for the time and effort he expends on his own behalf or for the professional business opportunities he forgoes as a result of his decision." (*Trope*, at p. 292.)

In *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084 (PLCM), the California Supreme Court held that "an entity that is represented by in-house counsel may recover attorney fees under Civil Code section 1717." (*Id.* at p. 1088; see Civ. Code, § 1717, subd. (a).) Our high court explained its rationale in *Trope*, as follows: (1) "the term 'attorney fees' implies the existence of an attorney-client relationship, i.e., a party

receiving professional services from a lawyer"; (2) to allow an award to an attorney representing himself in propria persona "would constitute disparate treatment, inimical to a statute [i.e., Civil Code section 1717,] designed to establish mutuality of remedy"—that is, an attorney representing himself in propria persona in a contractual dispute would be able to recoup attorney fees whereas a nonattorney representing himself in the same dispute would not be able to obtain such an award; and (3) the phrase "attorney fees" ordinarily means "consideration that a litigant actually pays or becomes liable to pay for legal representation." (*PLCM*, *supra*, 22 Cal.4th at p. 1092.)

*PLCM* noted that, in the case of in-house counsel, "[t]here is no problem of disparate treatment; in-house attorneys, like private counsel but unlike pro se litigants, do not represent their own personal interests and are not seeking remuneration simply for lost opportunity costs that could not be recouped by a nonlawyer. A corporation represented by in-house counsel is in an agency relationship, i.e., it has hired an attorney to provide professional legal services on its behalf. Nor is there any impediment to the effective and successful prosecution of meritorious claims because of possible ethical conflict or emotional investment in the outcome. The fact that in-house counsel is employed by the corporation does not alter the fact of representation by an independent third party. Instead, the payment of a salary to in-house attorneys is analogous to hiring a private firm on retainer." (*PLCM*, *supra*, 22 Cal.4th at p. 1093.) *PLCM* also noted another distinction between pro se litigants and corporations represented by in-house counsel: "'[A]n organization is not comparable to a *pro se* litigant because the organization is always represented by counsel, whether in-house or *pro bono*, and thus, there is always an attorney-client relationship.'" (*Id*. at p. 1094, quoting with approval *Kay v. Ehrler* (1991) 499 U.S. 432, 436, fn. 7.)

In *Ramona Unified School Dist. v. Tsiknas* (2005) 135 Cal.App.4th 510 (*Ramona Unified*), an environmental group filed an unsuccessful writ petition alleging a school district failed to comply with the California Environmental Quality Act in seeking to

27.

construct a new school.  (*Id*. at p. 514.)  Following dismissal of the action, the school district filed an action for abuse of process and barratry against the environmental group and its attorney. (*Ibid*.)  The defendants then moved to strike the complaint under section 425.16 and the trial court granted the motion and subsequently awarded attorney fees to the defendants. (*Ibid*.)  The school district appealed the award and argued that, under *Trope*, the award should not have included fees for time spent by the environmental group's attorney in defending the case because the attorney was a pro se litigant. (*Ramona Unified*, at p. 523.)

The *Ramona Unified* court held *Trope* did not bar the award.  (*Ramona Unified*, *supra*, 135 Cal.App.4th at p. 523.)  It wrote "*PLCM* pointed out 'that, by definition, the term "attorney fees" implies the existence of an attorney-client relationship, i.e., a party receiving professional services from a lawyer.' [Citations.]  Where an attorney-client relationship exists, the courts uniformly allow for the recovery of attorney fees under Civil Code section 1717." (*Ramona Unified*, at p. 524.)  It continued, "Cases that have allowed the recovery of attorney fees under the anti-SLAPP statute are similarly marked by the existence of an attorney-client relationship." (*Ibid*., citing numerous cases.)  The "decisional authority and the plain language of section 425.16, subdivision (c) support the conclusion that the commonly understood definition of attorney fees applies with equal force to section 425.16 and a prevailing defendant is entitled to recover attorney fees if represented by counsel." (*Ramona Unified*, at p. 524.)  The court expressly held that "[b]ecause an attorney-client relationship existed between the prevailing defendants and [their codefendant attorney], *Trope* does not preclude the award of attorney fees merely because [said attorney] was a codefendant with the nonattorney clients to whom she provided legal assistance." (*Id*. at p. 525.)

In *Carpenter & Zuckerman, LLP v. Cohen* (2011) 195 Cal.App.4th 373, the defendants filed a cross-complaint against a plaintiff law firm and its partners for alleged interference with economic advantage and defamation. (*Id*. at p. 376.)  The plaintiffs

successfully moved to strike the cross-complaint pursuant to section 425.16 but were denied their request for attorney fees under the statute. (195 Cal.App.4th at p. 376.) The *Carpenter* court determined substantial evidence supported the trial court's finding the plaintiff law firm had been represented in the action by one of its associates and not by an independent contractor. (*Ibid*.) The appellate court affirmed the order denying attorney fees, writing "the trial court was justified in concluding that based on the record, the individual plaintiffs could not recover attorney fees in connection with the appeal because there was no showing of any distinction between the cross-claims against the law firm plaintiff and those against the individual plaintiffs." (*Ibid*.)

In *Gilbert v. Master Washer & Stamping Co., Inc.* (2001) 87 Cal.App.4th 212 (*Gilbert*), the plaintiff sued the defendant for breach of a lease and for attorney fees. (*Id*. at p. 214.) In a separate action, the defendant sued the plaintiff for breach of contract and conversion of its property. (*Ibid*.) The defendant also sued the plaintiff's attorney for his role in preventing the defendant from obtaining its property from the leased premises. (*Ibid*.) The attorney was successful in getting the various claims against him dismissed by way of demurrer and summary judgment. (*Id*. at pp. 214–215.) However, the trial court denied the attorney an award of attorney fees because he was represented by attorneys in his own law firm. (*Id*. at p. 217.)

On appeal, the *Gilbert* court concluded the attorney who was sued did, in fact, incur attorney fees and that *Trope* did not bar an award of attorney fees. (*Gilbert*, *supra*, 87 Cal.App.4th at pp. 221–222.) The court described its holding, as follows: "[W]e hold a lawyer represented by other members of his law firm is entitled to recover reasonable attorney fees where the representation involved the lawyer's personal interests and not those of the firm." (*Id*. at p. 214.)

Here, the trial court granted the corporate defendants' motion for attorney fees largely upon the existence of an attorney-client relationship between R. Grace and the corporate defendants. Citing *Ramona Unified*, *supra*, 135 Cal.App.4th at page 524, the

29.

court noted "'[c]ases that have allowed the recovery of attorney fees under the anti-SLAPP statute are … marked by the existence of an attorney-client relationship ….'" It further noted that "[t]he court in [*Gilbert*] found the existence of an attorney-client relationship dispositive in deciding whether to award fees and distinguishing cases where fees were denied." The court noted "many of the reasons set forth in *PLCM* which permit attorney's fees for in-house counsel are not present here," and then went on to describe the differences. The court continued, "[h]owever, the [c]ourt finds, as it must, that a corporation must be represented and is always represented by counsel in active litigation and therefore, an attorney-client relationship must exist. This attorney-client relationship provides the basis for awarding fees to the corporate … [d]efendants."

Olin contends R. Grace did no work for the corporate defendants that he would not have done for himself and his spouse, J. Grace. He argues, "in representing the corporations he and his wife wholly own and wholly operate, [R.] Grace was not an independent third-party attorney and, instead, represented only what were inarguably his own personal interests in representing all four [d]efendants, and therefore, [R.] Grace was an entirely self-representing attorney and cannot recover any attorneys' fees."

Defendants cite to no authority in response to Olin's argument. They simply note (1) section 425.16, subdivision (c)(1) provides "a prevailing defendant on a special motion to strike shall be entitled to recover [his or her] attorney's fees and costs"; (2) "[t]he award was in favor of two corporations, not defendant … [R.] Grace"; and (3) the trial court reduced the award "based on the judge's assessment of how many hours should have been expended and 'additionally on apportionment for work performed on behalf of the corporations only.'" Defendants conclude by stating, "The meager award should not be disturbed."

We believe Olin's position has merit under the facts of this case.

In his declaration in support of the corporate defendants' motion for attorney fees, R. Grace noted MNC is a wholly owned subsidiary of GCI, and he is the president of

30.

GCI, vice-president of MNC, and senior general counsel for both. He further admitted he is the editor and chief writer for the publication, and he and his spouse are copublishers of the publication. In their brief in support of the motion for attorney fees, defendants admit the corporate defendants "are entities wholly owned by" R. Grace and J. Grace and, although denying any alter-ego relationship between the Grace defendants and the corporate defendants, "defendants acknowledge that there was no 'arms-length'" relationship between them.

Notably, R. Grace, in his declaration in support of the anti-SLAPP motion, admitted he wrote the original article that contained the alleged defamatory statement. R. Grace was involved in the decision to have MNC publish the article, i.e., he sent Olin an e-mail asking for "his comment, for publication, on the Court of Appeal's opinion in *Marriage of Olin*. To maximize accuracy in reporting his position, [R. Grace] asked for a copy of [Olin's] appellate brief." R. Grace further indicated that, had he received a response from Olin advising him of the terms of the permanent DVRO, he "would have eliminated reference to [Olin's] son in the article … or noted his statement." Finally, upon subsequently being informed of the terms of the permanent DVRO, R. Grace personally "altered [the] online version of the article by adding a preface" to the article.

Although there may have been an attorney-client relationship between R. Grace and the corporate defendants, we do not view that as dispositive of the question of whether the corporate defendants may obtain an attorney fee award for R. Grace's representation. R. Grace was not acting as an independent third party in representing the corporate defendants. Unlike the in-house counsel relationship discussed in *PLCM*, R. Grace was representing his personal interests in the litigation, which were largely one and the same with the corporate defendants' interests. And, unlike *PLCM*, there was not an absence of "possible ethical conflict or emotional investment in the outcome" of Olin's lawsuit. (*PLCM*, *supra*, 22 Cal.4th at p. 1093.) R. Grace was the author of the alleged defamatory statement and appears to have made the decision to publish the

31.

subject article(s) in his capacity as copublisher. Given the Grace defendants' complete ownership and control of the corporate defendants, any judgment that might have issued against the corporate defendants would have been to the detriment of R. Grace and J. Grace. Under such circumstances, to allow the corporate defendants to obtain an attorney fee award simply because R. Grace and J. Grace do business under a wholly owned corporation would be to elevate form over substance.

We believe the trial court placed undue emphasis on the existence of an attorney-client relationship as the primary (if not sole) basis for its award. The existence of such a relationship is not dispositive. Notably, although the *Gilbert* court did recognize such a relationship is necessary to an attorney fee award (*Gilbert*, *supra*, 87 Cal.App.4th at pp. 222–223), it also premised its holding on the fact "the representation involved the lawyer's personal interests *and not those of the firm*" that represented him (*id*. at p. 214, italics added). *Ramona Unified* is similar to *Gilbert* in that respect. There, the court allowed an attorney fee recovery for work performed by a codefendant attorney but the offending conduct alleged against the attorney stemmed from legal work she performed in advancing her clients' interests and not her own. (*Ramona Unified*, *supra*, 135 Cal.App.4th at pp. 515–519.)

As discussed *ante*, the factors that led *PLCM* to conclude a corporation may recoup attorney fees under Civil Code section 1717 for services rendered by in-house counsel are not present here. Rather, this case is more like *Carpenter*, where the court upheld the trial court's denial of attorney fees "because there was no showing of any distinction between the cross-claims against the law firm plaintiff and those against the individual plaintiffs." (*Carpenter & Zuckerman, LLP v. Cohen*, *supra*, 195 Cal.App.4th at p. 376.) Here, there is no distinction between the claims against R. Grace and the corporate defendants.

We conclude the trial court erred in awarding attorney fees to the corporate defendants.

## DISPOSITION

The order granting defendants' special motion to strike pursuant to section 425.16 is affirmed. The order granting defendants' attorney fees is reversed. The trial court shall enter a modified judgment consistent with the opinion. As modified, the judgment is affirmed.

PEÑA, J.

WE CONCUR:

LEVY, Acting P. J.

DETJEN, J.